**8**

**UNITED STATES, Appellee,**

v.

**William E. MORRIS, Aviation Antisubmarine Warfare Technician Airman Apprentice, U.S. Navy, Appellant.**

**No. 57,686.**

**NMCM 86 3613.**

U.S. Court of Military Appeals.

Feb. 28, 1989.

For Appellant: *Major J.L. Powers,* USMC (argued); *Lieutenant Commander Robert J. Smith,* JAGC, USN (on brief).

For Appellee: *Lieutenant Thomas J. Seaton,* JAGC, USNR (argued); *Captain Wendell A. Kjos,* JAGC, USN (on brief); *Lieutenant Yvonne M. Carroll,* JAGC, USNR.

*Opinion*

EVERETT, Chief Judge:

Appellant was tried by a general court-martial consisting of military judge alone; and, after his two motions to suppress were denied, he entered conditional pleas of guilty. Thereupon, he was convicted of wrongful possession of drug paraphernalia and wrongful introduction of cocaine with intent to distribute, in violation of Articles 92 and 112a, Uniform Code of Military Justice, 10 USC §§ 892 and 912a, respectively. Morris was sentenced to a dishonorable discharge, confinement for 1 year, total forfeitures, and reduction to E-1. The convening authority approved the sentence; and the Court of Military Review affirmed the findings and sentence. Thereafter, we granted these two issues for review: [1]

I

WHETHER THE MILITARY JUDGE ERRED IN DENYING THE DEFENSE MOTION TO SUPPRESS EVIDENCE SEIZED DURING A SEARCH OF THE APPELLANT'S AUTOMOBILE ON 21 NOVEMBER 1985 IN THAT THE AGENTS WERE NOT ACTING IN GOOD FAITH WHEN THEY PERFORMED THE SEARCH PURSUANT TO AN IMPROPERLY ISSUED SEARCH AUTHORIZATION.

1. These are the same two issues which appellant, upon entering his guilty pleas, had reserved the right to challenge on further review and appeal of his case. *See* RCM 910(a)(2).

## II

WHETHER THE MILITARY JUDGE ERRED IN DENYING THE DEFENSE MOTION TO SUPPRESS THE APPELLANT'S STATEMENT TO NIS SPECIAL AGENT P.D. LIM ON 25 NOVEMBER 1985 IN THAT AGENT LIM PURPOSELY DECLINED TO GIVE ARTICLE 31 WARNINGS BEFORE BEGINNING THE INTERROGATION.

## I

*The Search and Seizure*

### A

An identity-protected witness told Special Agent Lim of the Naval Investigative Service (NIS) that he believed Morris was dealing in drugs. However, none of the individuals who this witness said might have knowledge of appellant's involvement—including Morris' roommate—confirmed this information. A week later, around November 21, 1985, an anonymous caller telephoned three different members of Morris' unit and finally Special Agent Lim and stated that appellant was in possession of at least an ounce of cocaine and would be delivering it to the caller's house around 1:00 p.m. that day.

Reacting to this information, Special Agent Lim started looking for Morris' automobile and found it around 1:15. While arranging for surveillance of the car, Lim briefed Special Agent Butler on the situation and asked him to request a search authorization from the commanding officer at Naval Air Station Moffett Field. Before contacting the commander, Special Agent Butler asked the station staff judge advocate whether they had probable cause to search Morris' automobile. After he had received an affirmative answer, Butler asked the staff judge advocate to apprise the commanding officer of the events. At that time, Commander McArthur was the acting commanding officer of Moffett Field; and, after speaking to Special Agent Butler, he gave oral authorization to search the car.

Morris was observed entering his car at about 1:30 p.m. on November 21, 1985, which was immediately before the car was searched by NIS agents. They found 31.84 grams of cocaine under the driver's seat and different items of paraphernalia inside the car and on Morris himself. After the search, the request for search authorization from Commander McArthur and the authorization itself were reduced to writing.

At trial, Morris moved to suppress all the seized items on the ground that the search and seizure were illegal. The military judge ruled that no probable cause had existed to conduct the search and that the automobile exception to the warrant requirement did not apply. However, he observed that "if the police acted in good faith there would be no reason not to apply the doctrine of *Leon* to this particular case." After deciding that the NIS agents had acted in good faith on the basis of the search authorization from Commander McArthur, the military judge admitted the seized evidence.

The Court of Military Review agreed that no probable cause had existed to search Morris' car, "because the information provided by the anonymous telephone caller was of a general, background nature and did not satisfy the requirements enunciated in *Illinois v. Gates*, 462 U.S. [213], 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)." The court also agreed with the military judge that the search fell within "the 'good faith' exception" to the exclusionary rule, since "it was not unreasonable for the NIS agents not to have known that there was insufficient evidence to warrant probable cause for a search authorization." Unpub. op. at 3. Finally, the court rejected appellant's contentions that the NIS agents had intentionally misled the commanding officer when they sought the search authorization.

### B

In *United States v. Middleton*, 10 MJ 123, 126–27 (CMA 1981), this Court explained:

It has often been said that the Bill of Rights applies with full force to men and women in the military service unless any given protection is, expressly or by necessary implication, inapplicable. [Citations omitted.] While certain protections have been deemed inapplicable, neither this Court nor the Supreme Court has ever held that the Fourth Amendment does not shield the American serviceperson. "Indeed, the opposite is true." *United States v. Ezell*, [6 MJ 307] at 313 [CMA 1979].

This is not to say, however, that in its application the Fourth Amendment does not take into account the exigencies of military necessity and unique conditions that may exist within the military society. Military exigencies may be present under the particular facts of a given case, *see, e.g., United States v. Hessler*, 7 MJ 9 (CMA 1979); or they may exist with respect to a whole category of intrusions, *see United States v. Harris*, 5 MJ 44 (CMA 1978); *United States v. Unrue*, 22 USCMA 466, 47 CMR 556 (1973); *United States v. Poundstone*, 22 USCMA 277, 46 CMR 277 (1973). Of course, when it is suggested that a different rule should apply to military searches and seizures than to those in the civilian community, some burden exists to show the need for such a variation.

The Fourth Amendment's basic safeguard is against "unreasonable searches and seizures." In recent decisions, the Supreme Court has closely linked this protection to the reasonable expectations of privacy of the person asserting the Fourth Amendment claim. *Rawlings v. Kentucky*, 448 U.S. 98, 100 S.Ct. 2556, 2565, 65 L.Ed.2d 633 (1980); *Smith v. Maryland*, 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979); *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1979); *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Since "the military is, by necessity, a specialized society separate from civilian society," *see Parker v. Levy*, 417 U.S. 733, 743, 94 S.Ct. 2547, 41 L.Ed.2d 439

(1974), quoted in *Brown v. Glines*, 444 U.S. 348, 354, 100 S.Ct. 594, 599, 62 L.Ed.2d 540 (1980), it is foreseeable that reasonable expectations of privacy within the military society will differ from those in the civilian society.

(Footnotes omitted.)

We concluded in *Middleton* that the accused servicemember did not entertain reasonable expectations of privacy with respect to the time-honored military inspection, which "has traditionally been a 'tool' for a commander to use in insuring 'the overall fitness of [his] unit to perform its military mission.'" *Id.* at 127. In *Murray v. Haldeman*, 16 MJ 74 (CMA 1983), we decided that, under the particular circumstances there, compulsory urinalysis performed on the accused had constituted a reasonable search and seizure. *Cf. Unger v. Ziemniak*, 27 MJ 349 (CMA 1989). Likewise, an exit search conducted at an overseas military installation was held to be reasonable, even though not authorized by the specific language of the Military Rules of Evidence. *United States v. Alleyne*, 13 MJ 331 (CMA 1982).

This Court, however, has never gone so far as to say that a commander has free rein in determining when and where to search and seize the persons and effects of those under his command. Although we have great faith in military commanders, we have always recognized that their zeal may lead them to take action which is oppressive or unfair. This was one of the reasons why Congress enacted Article 37 of the Uniform Code, 10 USC § 837, which prohibits command influence on courts-martial. *Cf.* Art. 98, UCMJ, 10 USC § 898. Indeed, if commanders always acted responsibly, we would have had no occasion to remark that "[c]ommand influence is the mortal enemy of military justice." *United States v. Thomas*, 22 MJ 388, 393 (CMA 1986), *cert. denied*, 479 U.S. 1085, 107 S.Ct. 1289, 94 L.Ed.2d 146 (1987).

The Manual for Courts–Martial, United States, 1984, prescribes the circumstances under which a military commander may

authorize a search. *See* Mil.R.Evid. 315. According to the Manual, "probable cause" is necessary. Mil.R.Evid. 315(f)(1). Moreover, the commander must himself be "impartial," Mil.R.Evid. 315(d)—which is to say that he cannot be part of the investigation team. *Cf. United States v. Ezell*, 6 MJ 307, 318–19 (CMA 1979). Thus, if a military commander has engaged in the investigation of a crime, the authorization for a search must be obtained from some other commander, who is neutral and impartial, or from a military judge. *Cf.* Mil.R.Evid. 315(d).

Although Judge Cox' opinion would reject these Manual requirements, Judge Sullivan and I see no basis for doing so and overruling the well-established precedents of this Court. *See, e.g., United States v. Gebhart*, 10 USCMA 606, 610, 28 CMR 172, 176 (1959); *United States v. Brown*, 10 USCMA 482, 488, 28 CMR 48, 54 (1959). Furthermore, insofar as reasonable expectations of privacy are concerned, we have no doubt that the members of the All–Volunteer Force never enlisted with the belief that their persons or belongings could be searched whenever their commander chose—and without any recourse on their part except to complain under Article 138 of the Code, 10 USC § 938, if they felt they had been mishandled. *Cf. Chappell v. Wallace*, 462 U.S. 296, 302, 103 S.Ct. 2362, 2366–67, 76 L.Ed.2d 586 (1983). Not even the locker of a child in a public school can be searched merely at the whim of his teacher or principal. *See New Jersey v. T.L.O.*, 469 U.S. 325, 341–42, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985). With this in mind, we must reject the position taken by our Brother, Judge Cox.

## C

In *United States v. Leon*, 468 U.S. 897, 924, 104 S.Ct. 3405, 3421, 82 L.Ed.2d 677 (1984), the Supreme Court announced a "good-faith exception" to the exclusionary rule. There, police officers had searched in reasonable reliance on a warrant issued by a neutral and detached magistrate but which ultimately was found to be invalid because of a lack of probable cause. The rationale relied on by Justice White, writing for six justices, was that, under these circumstances, "[t]he substantial social costs exacted by the exclusionary rule," *id.* at 907, 104 S.Ct. at 3412, exceeded any potential benefits. The absence of benefit was explained in this manner:

To the extent that proponents of exclusion rely on its behavioral effects on judges and magistrates in these areas, their reliance is misplaced. First, the exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates. Second, there exists no evidence suggesting that judges and magistrates are inclined to ignore or subvert the Fourth Amendment or that lawlessness among these actors requires application of the extreme sanction of exclusion.

Third, and most important, we discern no basis, and are offered none, for believing that exclusion of evidence seized pursuant to a warrant will have a significant deterrent effect on the issuing judge or magistrate. Many of the factors that indicate that the exclusionary rule cannot provide an effective "special" or "general" deterrent for individual offending law enforcement officers apply as well to judges or magistrates. And, to the extent that the rule is thought to operate as a "systemic" deterrent on a wider audience, it clearly can have no such effect on individuals empowered to issue search warrants. Judges and magistrates are not adjuncts to the law enforcement team; as neutral judicial officers, they have no stake in the outcome of particular criminal prosecutions. The threat of exclusion thus cannot be expected significantly to deter them. Imposition of the exclusionary sanction is not necessary meaningfully to inform judicial officers of their errors, and we cannot conclude that admitting evidence obtained pursuant to a warrant while at the same time declaring that the warrant was somehow defective will in any way

reduce judicial officers' professional incentives to comply with the Fourth Amendment, encourage them to repeat their mistakes, or lead to the granting of all colorable warrant requests.

*Id.* at 916–17, 104 S.Ct. at 3417–18 (footnotes omitted).

*Leon* can be relied on to justify the result reached here by the military judge only if the search authorization from a commanding officer—here, an oral authorization later reduced to writing—is equated to a search warrant issued by a neutral and detached magistrate.[2] However, as noted in *United States v. Queen*, 26 MJ 136, 141–42 (CMA 1988), our precedents have not fully equated a military commander to a magistrate. For this reason, the commanding officer is not required to obtain sworn statements as a basis for giving a search authorization—although the warrant clause of the Fourth Amendment directs that a search warrant be issued only on the basis of probable cause established by affidavit. *See United States v. Stuckey*, 10 MJ 347 (CMA 1981).

In *United States v. Kalscheuer*, 11 MJ 373, 377 (CMA 1981), we recognized that military magistrates were used in some of the armed services, and we commented:

> [I]n some Services the burden on commanders in issuing search warrants has been relieved by the utilization of military magistrates who need not be lawyers, *cf. Shadwick v. City of Tampa*, 407 U.S. 345, 92 S.Ct. 2119, 32 L.Ed.2d 783 (1972), but whose acts are judicial in nature and, with respect to searches and seizures, are subject to the limitations imposed by the Warrant Clause of the Fourth Amendment. *Cf. United States v. Stuckey, supra* (opinion of Everett, C.J.). While a military magistrate must be "impartial," he is subject to additional role expectations—especially that he behave as a "judicial officer." Furthermore, the determinations of probable

cause by a military magistrate are entitled to the favorable treatment accorded similar determinations by civil magistrates. *United States v. Ventresca*, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); *United States v. Stuckey, supra.*

The rationale of *Leon* clearly would apply to a search authorized by a military magistrate. However, even though we recognize that commanding officers can be "neutral and detached," *see United States v. Ezell*, 6 MJ at 318, there is a question whether the association of commanding officers with law enforcement and with the maintenance of discipline is too great to permit equating them to a "magistrate."

Since Judge Cox concludes that the military commander properly authorized the search *qua* commander, he has no need to consider applicability of the good-faith exception. Judge Sullivan takes the position that, in view of the President's adoption of Mil.R.Evid. 311(b)(3)(C) (Ch. 2), the Court should apply the good-faith exception to the circumstances of the present case. In my own view, unless or until the Supreme Court expands the rationale of *Leon*, the good-faith exception should only be applied in courts-martial where law-enforcement personnel have reasonably relied on warrants or authorizations issued by military judges or military magistrates.

 Since two judges conclude—although for different reasons—that the evidence seized from appellant's car was admissible, the military judge did not err in admitting the evidence.

## II

### *The Public Safety Exception*

#### A

On November 21, 1985, after the cocaine and drug paraphernalia had been found on Morris and in his car, Special Agent Lim

---

2. *See also* Mil.R.Evid. 311(b)(3)(C), which recognizes a "good-faith exception" for searches performed in reliance on a commander's authorization, and Drafters' Analysis of Mil.R.Evid. 311(b)(3)(C), Manual for Courts–Martial, United States, 1984, at A 22–17 (Ch. 2). This provision became effective after the search in this case.

questioned him about the drug offenses. At first, Morris waived his Article 31, UCMJ, 10 USC § 831, rights and started making a statement; but then he requested counsel and terminated the interview.

Four days later, while Morris was on pretrial restriction to the base, he entered the Gate–Guard office at Moffett Field at about 2:00 a.m. and said "that he had to leave the base because someone was going to be killed and he had to do something to stop it. The security officer told" him "that he could not leave"; but, "on the pretense of turning off his engine," Morris "returned to his car and sped off." CMR unpub. op. at 2.

Subsequently, the security officer contacted Special Agent Lim. When he arrived at Moffett Field 2 hours later, Morris had already returned and had surrendered himself to the Moffett Field Police Department, where Lim then interviewed him. In the hearing on the motion to suppress, Lim explained that "[m]y primary concern in interviewing Morris was to determine whether or not anybody had been injured or killed. Who the intended victim was and if the victim was okay. And whether or not there was any existing—against the victim." Before interviewing Morris, Lim had not given him any Article 31 warning. "For one reason, I was aware that he already exercised his rights a few days earlier and secondly I didn't want to jeopardize being able to determine—getting the information as to whether or not somebody was in danger or had already been hurt." In the course of the interview, Morris made several incriminating statements about his possession of cocaine—which had been the subject of Lim's discussion with him 4 days before.

On cross-examination, Special Agent Lim acknowledged that before he interviewed Morris, who was then in a jail cell, he had already talked to security personnel. They had informed him that when Morris had returned to Moffett Field, "he gave the impression that everything was all right." Lim then went in around 4:00 a.m. and talked to Morris, who, "at one point," told Lim "that everything is okay." Then Lim asked Morris "something to the effect of, 'How did this all happen?' or some question like this." Lim "asked him general questions and later on ... asked him more specific questions." Gradually, Lim elicited some incriminating statements. Lim answered affirmatively this question by the defense counsel:

So basically, after you spent perhaps a couple minutes with him talking, as if he were—he continued [to] talk to you. Continued to make incriminating statements and yet you never, at that point, having realized that there was no emergency and so forth, you never then asked him to stop or read him his rights, or re-asked him about a lawyer, did you?

At trial, Morris moved to suppress the jail statements because they were not preceded by Article 31 warnings. However, the military judge ruled that no warning was required because of appellant's earlier comments when he left Moffett Field at 1:00 o'clock that morning; and the judge explained:

It appears to me that language of that sort legitimately requires law enforcement authorities, at a minimum, to ask, "what's going on?" in an effort to see if there is something that can be done.

The military judge also noted that there was

no clear cut dividing line where the agent stops talking about this murder business and then begin[s] to reopen the interrogation. As part of background information, the accused chose to furnish certain information that became an integral part of his response to a legitimate interrogation. Therefore in a limited stance, by selecting this course of action in an effort to get off restriction, the accused has essentially invited the Government to talk to him again somewhat akin to reopening the interrogation, not exactly, but somewhat like it and the court feels that a new warning was not required at that point and nor was there a warning required when he got to some information that may have been part of the old

interrogation because it was so mixed in with the other information.

In upholding the military judge's admission of appellant's incriminating statements to Special Agent Lim, the Court of Military Review reasoned that Lim's intent was not to elicit incriminating statements but instead to question him in an effort to ascertain if there was a victim in need of immediate assistance.

## B

In *United States v. Jones*, 26 MJ 353, 356–57 (CMA 1988), we indicated that Article 31(b) should be interpreted in tandem with *New York v. Quarles*, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984). Thus, a warning would not be required if the questions were asked to protect the public safety.

However, the situation here is quite different from *Quarles*. There, the defendant was asked a question in order to locate a weapon which might have injured persons using the supermarket where the defendant was arrested. In this case, Morris had returned to Moffett Field and had been placed in a jail cell. Also, he had informed the security personnel there "that everything was all right." Thus, it seems doubtful that any emergency existed when Lim arrived on the scene—if it had ever existed, and Lim was aware of this from the beginning.

■ However, even if we assumed that Special Agent Lim would be entitled to ask Morris some questions about a possible murder or assault without giving him an Article 31(b) warning, we do not agree that the justification of an "emergency" could be utilized as a basis for unwarned interrogation after Lim became aware that no emergency existed.

Lim knew that, at the interrogation 4 days before, Morris had exercised his right to remain silent and to consult with an attorney. Therefore, the investigator was not free to question Morris unless appellant "initiated" a conversation. *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981); *Oregon v. Bradshaw*, 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983). In *Bradshaw* the defendant "initiated" the conversation by asking, "Well, what is going to happen to me now?" *Id.* at 1042, 103 S.Ct. at 2833. On the other hand, Morris was not asking any questions but, instead, was answering Lim's question, "What's going on here?" Thereafter, still without giving any warning, Lim proceeded to ask more specific questions.

Under the circumstances here, we do not believe that admission of the incriminating statements can be upheld on the rationale that they were obtained as part of protecting the "public safety." Indeed, the questions that elicited appellant's incriminating answers were no more related to the "public safety" than any other interrogation by police officers anxious to protect the public from criminals. Accordingly, these statements should have been excluded.

## III

Even though a majority of this Court concludes that the evidence seized from the car was admissible, the findings of guilty still cannot stand because reception of appellant's statements in evidence was prejudicial error.

The decision of the United States Navy–Marine Corps Court of Military Review is reversed; the findings of guilty and the sentence are set aside. The record of trial is returned to the Judge Advocate General of the Navy. A rehearing may be ordered.

COX, Judge (concurring in part and dissenting in part):

Although I concur fully with part II of the lead opinion, I write to express my grave concern with the development of search and seizure law in the military society and to urge a fresh look at the proper application of the Fourth Amendment to that society.

The Fourth Amendment to the United States Constitution protects people and

their property "against unreasonable searches and seizures."[1] The exclusionary rule was fashioned as the enforcement mechanism to make this protection other than illusory. *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); *Wolf v. Colorado*, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949); *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914). The primary purpose of the rule is to remove incentive on the part of law enforcement officials to abuse the rights of the people. *United States v. Leon*, 468 U.S. 897, 906, 104 S.Ct. 3405, 3412, 82 L.Ed.2d 677 (1984); *Stone v. Powell*, 428 U.S. 465, 484–86, 96 S.Ct. 3037, 3047–49, 49 L.Ed.2d 1067 (1976).[2]

Generally speaking, it is said that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967) (footnotes omitted); *see also Coolidge v. New Hampshire*, 403 U.S. 443, 454–55, 91 S.Ct. 2022, 2031–32, 29 L.Ed.2d 564 (1971); *Jones v. United States*, 357 U.S. 493, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1958); *United States v. Jeffers*, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951); *McDonald v. United States*, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948).

These well-delineated exceptions include warrantless searches and seizures based on:

(1) consent, *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct.2041, 36 L.Ed.2d 854 (1973); *Frazier v. Cupp*, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969);

(2) incidence to a lawful arrest, *Chimel v. California*, 395 U.S. 752, 89 S.Ct.2034, 23 L.Ed.2d 685 (1969);

(3) probable cause plus exigent circumstances, *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct.1975, 26 L.Ed.2d 419 (1970); *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966);

(4) hot pursuit, *Warden v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967);

(5) stop and frisk, *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); and

(6) administrative inspections of "closely regulated" businesses, *New York v. Burger*, 482 U.S. 691, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987).

Where such exceptions are applicable, searches and seizures are reasonable notwithstanding the lack of a warrant based on probable cause.

There are many sets of circumstances, however, in which the prescription of the Fourth Amendment does not even apply. For example, unless the accused has an "expectation of privacy ... that society is prepared to recognize as 'reasonable,'" the Fourth Amendment is no refuge. *Rakas v. Illinois*, 439 U.S. 128, 143–44 n. 12, 99 S.Ct. 421, 430–31 n. 12, 58 L.Ed.2d 387 (1978), *quoting Katz v. United States*, 389 U.S. at 361, 88 S.Ct. at 516 (Harlan, J., concurring); *see also Rawlings v. Kentucky*, 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980); *United States v. Salvucci*, 448 U.S. 83, 100 S.Ct.

---

**1.** The Fourth Amendment provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

**2.** The prohibition against "unreasonable searches and seizures" was a response to

[t]he practice [that] had obtained in the colonies of issuing writs of assistance to the reve-

nue officers, empowering them, in their discretion, to search suspected places for smuggled goods, which James Otis pronounced "the worst instrument of arbitrary power, the most destructive of English liberty, and the fundamental principles of law, that ever was found in an English law book;" since they placed "the liberty of every man in the hands of every petty officer."

*Boyd v. United States*, 116 U.S. 616, 625, 6 S.Ct. 524, 529, 29 L.Ed. 746 (1886); *see also Weeks v. United States*, 232 U.S. 383, 389–91, 34 S.Ct. 341, 343–44, 58 L.Ed. 652 (1914).

2547, 65 L.Ed.2d 619 (1980). Thus, it does not apply to abandoned property, *Abel v. United States*, 362 U.S. 217, 241, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960); things exposed to public view, *Cardwell v. Lewis*, 417 U.S. 583, 591, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974) (Plurality opinion); *Katz v. United States*, 389 U.S. at 351, 88 S.Ct. at 511; "open fields," *Oliver v. United States*, 466 U.S. 170, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984); *Hester v. United States*, 265 U.S. 57, 58, 44 S.Ct. 445, 446, 68 L.Ed. 898, 900 (1924); border searches, *United States v. 12 200–Ft. Reels of Film*, 413 U.S. 123, 125–26, 93 S.Ct. 2665, 37 L.Ed.2d 500 (1973); certain bank records, *United States v. Miller*, 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976); or prisoners in their cells, *Hudson v. Palmer*, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984).

Moreover, the Fourth Amendment does not extend to officials of foreign governments, *Brulay v. United States*, 383 F.2d 345 (9th Cir.), *cert. denied*, 389 U.S. 986, 88 S.Ct. 469, 19 L.Ed.2d 478 (1967); and it does not apply if the searcher is a private person, rather than a government agent, *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984).

In addition, a greatly reduced expectation of privacy attaches to automobiles by virtue of their inevitable public exposure. *United States v. Knotts*, 460 U.S. 276, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983); *South Dakota v. Opperman*, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976); *Cardwell v. Lewis, supra.*

The reasonableness of a search or seizure, however, is "[t]he ultimate standard set forth in the Fourth Amendment." *Cady v. Dombrowski*, 413 U.S. 433, 439, 93 S.Ct. 2523, 2527, 37 L.Ed.2d 706 (1973); *Camara v. Municipal Court*, 387 U.S. 523, 539, 87 S.Ct. 1727, 1736, 18 L.Ed.2d 930 (1967). The Supreme Court has long recognized that "[t]he test of reasonableness cannot be stated in rigid and absolute terms." *Harris v. United States*, 331 U.S. 145, 150, 67 S.Ct. 1098, 1101, 91 L.Ed. 1399 (1947). In *Terry v. Ohio, supra,* for example, the self-preservation need of the officer to frisk the suspect on-the-spot, without obtaining a warrant and without full probable cause, was "tested by the Fourth Amendment's general proscription against unreasonable searches and seizures," and found to be "reasonable ... under the Fourth Amendment." 392 U.S. at 20, 31, 88 S.Ct. at 1885 (footnote omitted).

In *New Jersey v. T.L.O.*, 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985), the Court held that the Fourth Amendment applied to searches conducted by public school officials and that school children had legitimate expectations of privacy. 469 U.S. at 333, 338. Nonetheless, a warrantless search of the purse of a student who had been observed smoking on school premises, in violation of school rules, was reasonable under the Fourth Amendment, even though probable cause was lacking. *Id.* at 343.

As the Court noted:

Where a careful balancing of governmental and private interests suggests that the public interest is best served by a Fourth Amendment standard of reasonableness that stops short of probable cause, we have not hesitated to adopt such a standard.

*Id.* at 341, 105 S.Ct. at 742. *See also O'Connor v. Ortega*, 480 U.S. 709, 724, 107 S.Ct. 1492, 1502, 94 L.Ed.2d 714 (1987) (plurality opinion) (standard of reasonableness, rather than probable cause, governs employers' "work-related, noninvestigatory intrusions as well as investigations of work-related misconduct").

In *United States v. Ramsey*, 431 U.S. 606, 616, 97 S.Ct.1972, 52 L.Ed.2d 617 (1977), the Court declared that

searches made at the border, pursuant to the long-standing right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border.

Thus, even in civilian society, the Supreme Court looks to context to determine whether the official conduct was reasonable.

What then has the Supreme Court said about the military environment? For one, it recognizes the military as a "specialized society separate from civilian society." *Parker v. Levy,* 417 U.S. 733, 743, 94 S.Ct. 2547, 2555, 41 L.Ed.2d 439 (1974). The Court has long noted "[t]he peculiar and special relationship of the soldier to his superiors." *United States v. Brown,* 348 U.S. 110, 112, 75 S.Ct. 141, 143, 99 L.Ed. 139 (1954) (due to effect on discipline, etc., Tort Claims Act does not cover servicemen's injuries arising out of or incident to service); *see also Chappell v. Wallace,* 462 U.S. 296, 298–99, 103 S.Ct. 2362, 2364–65, 76 L.Ed.2d 586 (1983) (enlisted personnel barred from suing superior officers for alleged constitutional violations).

The difference between the military and the civilian communities results from "the primary business of armies and navies [being] to fight or be ready to fight wars should the occasion arise." *United States ex rel. Toth v. Quarles,* 350 U.S. 11, 17, 76 S.Ct. 1, 5, 100 L.Ed. 8 (1955); *see also Burns v. Wilson,* 346 U.S. 137, 140, 73 S.Ct. 1045, 1048, 97 L.Ed. 1508 (1953) (plurality opinion); *Orloff v. Willoughby,* 345 U.S. 83, 94, 73 S.Ct. 534, 540, 97 L.Ed. 842 (1953). "An army is not a deliberative body. It is the executive arm. Its law is that of obedience. No question can be left open as to the right to command in the officer, or the duty of obedience in the soldier." *Parker v. Levy, supra* 417 U.S. at 744, 94 S.Ct. at 2556, quoting *In re Grimley,* 137 U.S. 147, 153, 11 S.Ct. 54, 55, 34 L.Ed. 636 (1890); *see also Chappell v. Wallace, supra* 462 U.S. at 300, 103 S.Ct. at 2363; *Schlesinger v. Councilman,* 420 U.S. 738, 757, 95 S.Ct. 1300, 1313, 43 L.Ed.2d 591 (1975).

Similarly, although "the guarantees of the First Amendment" are "not ... render[ed] entirely nugatory in the military context," the Court's "review of military regulations challenged on First Amendment grounds is far more deferential than constitutional review of similar laws or regulations designed for civilian society." *Goldman v. Weinberger,* 475 U.S. 503, 507, 106 S.Ct. 1310, 1313, 89 L.Ed.2d 478 (1986).

Relying on these differences between the military and civilian societies, we have held it to be reasonable under the Fourth Amendment for military commanders to authorize searches and seizures within their respective commands. *United States v. Stuckey,* 10 MJ 347, 359–61 (CMA 1981). Further, such authorizations need not invariably be committed to writing or based upon sworn information. *Id.* at 358, 363–65.

In addition, we have ruled that "traditional" military inspections, which often invade servicemembers' privacy extensively, are reasonable under the Fourth Amendment. *United States v. Middleton,* 10 MJ 123, 128 (CMA 1981); *see* Mil.R.Evid. 313, Manual for Courts-Martial, United States, 1984. Even seizure of a servicemember's urine, pursuant to a compulsory urinalysis program, is "reasonable" "within the meaning of the Fourth Amendment." *Murray v. Haldeman,* 16 MJ 74, 81 (CMA 1983); *see also Committee for GI Rights v. Callaway,* 518 F.2d 466, 477 (D.C.Cir.1975).

On the other hand, in *United States v. Roberts,* 2 MJ 31, 36 n.16 (CMA 1976), one judge declared that servicemembers have "reasonable expectation[s] of privacy" in their barracks rooms. Further, a majority of this Court has concluded that, if a commander has reason to suspect that evidence of crime might be found in the barracks in an area assigned to one of his subordinates, the commander must have full probable cause to search or inspect that area. *United States v. Moore,* 23 MJ 295 (CMA 1987). Similarly, the opinion in *United States v. Johnston,* 24 MJ 271, 274 (CMA 1987), cautioned that "a compulsory urinalysis ... may still amount to a subterfuge search requiring probable cause if it were ordered primarily for the purposes of prosecution."

I registered my disagreement with these views in *United States v. Moore, supra* at 299–300, where I questioned the legitimacy

of a soldier's expectation of privacy in the barracks, *vis-a-vis* his commander. I have since modified my views somewhat. The essence of my disagreement with the way search and seizure law applies to military society is that we have tried to adopt rules that superimpose onto the military various Fourth Amendment concepts fashioned by the Supreme Court for civilian society. These rules generally have no applicability to the relationship of a *commander to members of his command;* and most certainly an *exclusionary rule* that suppresses otherwise good and competent evidence of criminal conduct serves no purpose when the evidence is obtained as a result of a conscientious, well-reasoned, *i.e.* plausible, command decision.[3]

My syllogism is simple. If a commander is acting responsibly, what societal values are we protecting by excluding evidence obtained as a result of his responsible conduct? I suggest we are reaching an opposite result when we suppress evidence obtained by responsible command action, for, after all, doesn't society demand that its military commanders act responsibly?

For example, in *Murray v. Haldeman, supra,* we recognized the right of command to conduct a urinalysis program. Therefore, we allow evidence to be seized for no reason. On the other hand, in *United States v. White,* 27 MJ 264 (CMA 1988), where the commanding officer had a suspicion based on less than probable cause, we found the search unlawful and suppressed the evidence. Although we relied on a violation of the applicable military rule of evidence to suppress the results of the urinalysis, our decision, which I authored, does not appear to have reached a logical result. Why is evidence obtained by a general search founded upon *no reason* admissible, but evidence obtained by a responsible commander for some reason is inadmissible? What different societal value

are we protecting? In both cases the invasion of privacy is equal. In both cases evidence of drug use is obtained without consent.

It seems to me what we have overlooked is the fundamental question of the reasonableness of the governmental action.[4] *Cady v. Dombrowski* and *Camara v. Municipal Court,* both supra. If the commander was reasonable in authorizing the search of appellant's vehicle, in light of the information available to him, the evidence should not be suppressed. Stated another way, if the commander would have been remiss in failing to act to abate the potential threat to the installation, personnel, and mission, then the evidence should not be suppressed. It would appear, therefore, that searches predicated on Fourth Amendment reasonableness, as opposed to the warrant clause, are the sort contemplated by Mil.R.Evid. 314(k), which provides:

A search of a type not otherwise included in this rule and not requiring probable cause under Mil.R.Evid. 315 may be conducted when permissible under the Constitution of the United States as applied to members of the armed forces.

Application of these principles to a particular case would seem to depend on several factors, including the quantum and quality of the accusatory information, the expectations of privacy in the area searched, the extent of the intrusion, and the relative degree of threat posed to the installation and the mission. Given the considerably diminished expectations of privacy in an automobile—particularly one on a military installation—coupled with the relatively minimal intrusion involved here and the severity of the threat to the mission, it seems to me that this commander would have been grossly irresponsible if he had not moved swiftly to eliminate the threat. In my view, therefore, this search

---

**3.** This authority over persons, places and instrumentalities exists in the military only through appropriate command structure. Thus, law enforcement officers and others, acting on their own, are not free to invade reasonable expectations of privacy without prior authorization, un-

less one of the "well-delineated" exceptions to the warrant requirement applies.

**4.** For an excellent review of how we got to this point in search and seizure law, *see* Wright, *How to Improve Military Search and Seizure Law,* 116 Mil.L.Rev. 157 (1987).

was reasonable, even though I recognize that the information available to the commander fell short of full probable cause.

I certainly agree that servicemembers enjoy the protection of the Fourth Amendment. The issue, however, is the reasonableness of the intrusion under the circumstances. In this day of rampant drug abuse, and considering the deleterious effect it can have on performance and reliability—not to mention the ever-present threat of terrorism—it seems to me that a commander's authority over the persons, places, and instrumentalities essential to defending the nation ought to be very broad indeed.[5] Where such authority is abused, such as through harassment, prejudice, arbitrariness, etc., or where it is extended to persons, places, and instrumentalities not properly under command control, the conduct is not reasonable and the military judge can deal with it on an appropriate motion.

For these reasons, I disagree with part I of the lead opinion and would uphold the conclusion of the courts below in admitting the fruits of the search.

SULLIVAN, Judge (concurring in part and in the result):

I concur with my Brother's analysis on The Public Safety Exception. On the search and seizure issue, although I join the Chief Judge's rejection of Judge Cox' expansive view, I would hold the evidence constitutionally admissible under the good-faith exception to the exclusionary rule. *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). *See* Mil. R.Evid. 311(b)(3)(C), Manual for Courts-Martial, United States, 1984. This is consistent with my general approach to similar constitutional questions raised at courts-martial. *See United States v. Roa*, 24 MJ 297, 302–03 (CMA 1987) (Sullivan, J., concurring in the result). *See generally United States v. Battles*, 25 MJ 58, 60 (CMA 1987); *United States v. Johnston*, 24 MJ 271, 274 (CMA 1987).

---

5. Thus, the military enclave presents quite a different environment from the civilian's humble abode where, in the immortal words of Sir William Pitt:

> The poorest man may in his cottage bid defiance to all the force of the Crown. It may be frail, its roof may shake; the wind may blow through it; the storm may enter; the rain may enter; but the King of England can not enter; all his force dare not cross the threshold of the ruined tenement!

Speech, Excise Bill, quoted in B.Evans, *Dictionary of Quotations* 328 (1968).