UNITED STATES

v.

Jonathan N. HOLLOWAY, 434 43
1454 Private First Class (E–2),
U.S. Marine Corps.

NMCM 92 0186.

U.S. Navy–Marine Corps Court of
Military Review.

Sentences Adjudged 15 Oct. 1991.

Decided 3 March 1993.

LT David P. Sheldon, JAGC, USNR, Appellate Defense Counsel.

LT Scott A. Browne, JAGC, USNR, Appellate Government Counsel.

Before LARSON, C.J., FREYER, STRICKLAND JONES and ORR, Senior Judges, and WELCH, MOLLISON, REED and LAWRENCE, JJ.

## OPINION OF THE COURT *EN BANC*

WELCH, Judge:

This guilty plea-unauthorized absence case [1] raises a significant issue concerning pretrial confinement. We must determine whether *County of Riverside v. McLaughlin*, — U.S. —, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991) applies to the U.S. Armed Forces.[2] We conclude it does, based on the following reasoning.

### I. THE HOLDING IN *COUNTY OF RIVERSIDE V. MCLAUGHLIN*

The case was a class action challenging the manner in which the county provided probable cause hearings for persons arrested without a warrant. Under the county's procedures, weekends and holidays were not counted when determining whether an arrested person was afforded a probable cause determination without unnecessary delay under the county's "two-day" arraignment policy. Thus, over the Thanksgiving holiday, it was possible to have a seven day delay between arrest and a determination of probable cause for arrest.

The Supreme Court granted certiorari to resolve a conflict among four circuit courts of appeals as to the meaning of a "prompt" probable cause determination under the requirements of *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975).

*Gerstein* held that the Fourth Amendment requires a prompt judicial determination of probable cause as a prerequisite to an extended pretrial detention following a warrantless arrest.

After noting that the vague standard of *Gerstein* (i.e., "prompt") simply had not provided sufficient guidance, the Court stated:

> Our task in this case is to articulate more clearly the boundaries of what is permissible under the Fourth Amendment. Although we hesitate to announce that the Constitution compels a specific time limit, it is important to provide some degree of certainty so that States and counties may establish procedures with confidence that they fall within constitutional bounds. Taking into account the competing interests articulated in *Gerstein*, we believe that a jurisdiction that provides judicial determinations of probable cause within 48 hours of arrest will, as a general matter, comply with the promptness requirement of *Gerstein*. For this reason, such jurisdictions will be immune from systemic challenges.

— U.S. at —, 111 S.Ct. at 1670.

The Court then established a "bright line" presumption:

> Where an arrested individual does not receive a probable cause determination within 48 hours, the calculus changes. In such a case, the arrested individual does not bear the burden of proving an unreasonable delay. Rather, the burden shifts to the government to demonstrate the existence of a bona fide emergency or other extraordinary circumstances. The fact that in a particular case it may take longer than 48 hours to consolidate

---

**1.** The appellant was tried by special court-martial on 15 October 1991. Based on pleas of guilty, he was convicted of three violations of Article 86, Uniform Code of Military Justice (UCMJ) Article 86, 10 U.S.C. § 886 (unauthorized absences from 4 January 1990 to 29 March 1991, 19 May to 17 July 1991, and 18 July to 1 August 1991). The judge sentenced him to confinement for four months, forfeiture of $500 pay per month for four months, reduction to pay grade E-1, and a bad-conduct discharge.

**2.** After this case arrived without assignments of error, we specified two issues:

I. ARE THE PRETRIAL CONFINEMENT REVIEW PROVISIONS IN R.C.M. 305(h)(2)(A) AND (i)(1) TIMELY IN LIGHT OF *COUNTY OF RIVERSIDE v. McLAUGHLIN*, — U.S. —, 111 S.CT. 1661?

II. IF NOT, WHAT RELIEF IS APPROPRIATE FOR A VIOLATION OF THE TIME LIMIT ESTABLISHED IN *McLAUGHLIN*?

pretrial proceedings does not qualify as an extraordinary circumstance. Nor, for that matter, do intervening weekends. A jurisdiction that chooses to offer combined proceedings must do so as soon as reasonably feasible, but in no event later than 48 hours after arrest.

*Id.*

## II. PROCEDURES FOR REVIEW OF PRETRIAL CONFINEMENT UNDER THE RULES FOR COURTS–MARTIAL

Rule for Courts–Martial (R.C.M.) 305 includes specific requirements for pretrial confinement of service members, including a first step "72–hour" rule followed by a second step "7–day" rule. Specifically:

A. R.C.M. 305(h)(2)(A) requires that "[n]ot later than 72 hours after ordering a prisoner into pretrial confinement, or after receipt of a report that a member of the commander's unit or organization has been confined, the commander shall decide whether pretrial confinement will continue." R.C.M. 305(h)(2)(B) directs that the commander order release of the prisoner unless the commander believes that there is probable cause for continued confinement, based upon standards stated in the Rule.

B. R.C.M. 305(i)(1) requires that "[a] review of the adequacy of probable cause to believe the prisoner has committed an offense and of the necessity for continued pretrial confinement shall be made within 7 days of the imposition of confinement." R.C.M. 305(i)(2) requires that this review be made by a "neutral and detached officer appointed in accordance with regulations prescribed by the Secretary concerned."

C. Exceptions to the above requirements are authorized by R.C.M. 305(m) (n.b., based on operational requirements and confinement of personnel at sea).

The above cited rules were drafted to comport with the requirements of *Gerstein* and decisions of the Court of Military Appeals, including *Courtney v. Williams,* 1 M.J. 267 (C.M.A.1976). Analysis, R.C.M. 305, MCM, App. 21–16.

## III. PRECEDENT OF THE COURT OF MILITARY APPEALS

■ In *Courtney v. Williams,* the Court of Military Appeals reviewed a petition for extraordinary relief challenging the legality of the petitioner's pretrial confinement. After quoting from *Gerstein* and observing that the UCMJ provided no procedure for reviewing the probable cause determination made by a person ordering pretrial confinement of a service member, the Court held that a neutral and detached magistrate must decide whether there is probable cause for such pretrial confinement (and whether the service member should be confined). Most importantly, the Court stated:

We believe that those procedures required by the Fourth Amendment in the civilian community must also be required in the military community. We discern no considerations of military necessity that would require a different rule. Moreover, respondents conceded during oral argument *Gerstein*'s applicability to the military.

*Courtney,* 1 M.J. at 270.

The Court of Military Appeals' deference to *Gerstein* has been evidenced in decisions further defining the meaning of *Courtney v. Williams.* For example, in *United States v. Lynch,* 13 M.J. 394 (C.M.A.1982), the Court announced that "[i]n light of *Gerstein v. Pugh*" the Court believed that three categories of officials were constitutionally qualified to be judicial officers who could make the pretrial confinement probable cause decisions (i.e., a military judge, a military magistrate empowered by service regulations, and any other person authorized by the UCMJ to confine who is not directly or particularly involved in the command's law enforcement function). 13 M.J. at 397. *See also United States v. Stuckey,* 10 M.J. 347 (C.M.A.1981); *United States v. Malia,* 6 M.J. 65 (C.M.A.1978).

A Court of Military Review is not generally free to ignore a precedent established by the Court of Military Appeals. *United States v. Jones,* 23 M.J. 301, 302 (C.M.A. 1987). In our opinion, this requirement to follow precedent is particularly important in cases involving constitutional issues.

Because we believe the Court of Military Appeals has established the precedent that *Gerstein* is applicable in the Armed Forces, and *Gerstein* involves a constitutional issue, we conclude that we must follow that precedent. Since we must follow *Gerstein,* we logically conclude that we must also follow a decision of the Supreme Court further defining the meaning of terms in *Gerstein,* unless otherwise directed by the Court of Military Appeals.

## IV. EFFECT OF PRECEDENT ON R.C.M. 305

█ The Government agrees with the appellant that his commanding officer's "72-hour" review, by itself, did not satisfy the requirements of *Gerstein* and *County of Riverside v. McLaughlin.* However, for clarification, we hold that a commanding officer's review within 72 hours of pretrial confinement of a member of his or her command (i.e., the review required by R.C.M. 305(h)(2)) does not satisfy the requirement for a prompt determination of probable cause for confinement by a neutral and detached officer. *See Lynch, supra.*

█ Additionally, based on precedent discussed above, we join the United States Army Court of Review (*en banc*) in holding "that the seven-day time requirement for the review of probable cause for pretrial confinement as required by R.C.M. 305(i)(1) will not pass constitutional muster." *United States v. Rexroat,* 36 M.J. 708, 712 (A.C.M.R.1992). More precisely, we hold that when a service member does not receive a probable cause determination within 48 hours of being placed in pretrial confinement, the burden shifts to the Government to demonstrate the existence of a bona fide emergency or other extraordinary circumstances justifying the failure to provide such a determination.

█ Lastly, we hold that the combination of the two requirements imposed by the "72-hour" rule of R.C.M. 305(h)(2) and the "7-day" rule of R.C.M. 305(i)(1) does not satisfy the requirements imposed by precedential decisions cited above. This determination is made to address an argument made by the Government during oral argument that is not fully presented in the Government's brief (i.e., that the two-step process in its entirety satisfied the requirements for a prompt review by a neutral and detached officer, and was appropriately created by the President after due consideration of numerous factors related to confinement of military personnel that have no parallel in civilian society).

## V. COMMENTS ON VIEWS OF THE MINORITY

In contending for conclusions contrary to those stated above, the dissenters advance the argument, *inter alia,* that the President has properly acted pursuant to authority granted him by Article 36, UCMJ, 10 U.S.C. § 836; that the rights of service members under the Bill of Rights may be slightly different from the rights of civilians; and that the President signed R.C.M. 305 after considering numerous factors relating to confinement of military personnel (e.g., their pay continues while confined, they have defense counsel available, their commanders can make determinations concerning searches and seizures of property, and their commanders may have other pressing military responsibilities that limit the ability to provide a probable cause determination within 48 hours of confinement). We acknowledge that this logic has a certain appeal to us (see Judge Cox's concurring with modest reservations opinion in *United States v. Lopez,* 35 M.J. 35 (C.M.A.1992) and Judge Cook's dissenting opinion in the 2–1 decision in *Lynch, supra* at 398–399). That said, we repeat that we feel bound by the precedent of the Court of Military Appeals discussed above. *See generally Payne v. Tennessee,* —— U.S. ——, ——, 111 S.Ct. 2597, 2610, 115 L.Ed.2d 720 (1991) (recent comments of the Supreme Court concerning the doctrine of *stare decisis* ).

In rejecting the views of the minority, we have also considered the comment in *Courtney v. Williams* concerning the applicability of the Bill of Rights to persons in the military: "[t]he burden of showing that military conditions require a different

rule than that prevailing in the civilian community is upon the party arguing for a different rule." *Courtney*, 1 M.J. at 270. In our opinion, the Government has not shown in either its brief or oral argument that military conditions require a different rule than that which prevails in the civilian community. Additionally, we cannot ignore the fact that a "48–hour" rule has been in effect in the U.S. Army since 24 May 1991, apparently without significant adverse consequences. *See Rexroat*, 36 M.J. at 712 n. 5 (message from Army TJAG to field).

Additionally, we have considered the practical consequences of our decision with regard to the transportation, confinement, and processing of absentees at locations around the country and world far from the absentees' duty stations. *See United States v. Ballèsteros*, 29 M.J. 14 (C.M.A. 1989). Although we do not have answers for every combination and permutation of absentee problems that may arise, we are confident that the practical problems associated with the movement of absentees under guard across the country will normally provide adequate reasons for rebutting the presumption created by *County of Riverside v. McLaughlin.*[3]

## VI. EFFECT OF PRECEDENT ON THE CASE AT BAR

██ Appellant was arrested by civilian police on 29 March 1991 based on his status as an absentee, and held by them on behalf of military authorities until 4 April 1991. Appellant agrees that he was not entitled to credit for illegal pretrial confinement during that period because *County of Riverside v. McLaughlin* was not decided until 13 May 1991. Brief for Holloway at 11 n. 11.

At the 15 October 1991 trial, appellant was awarded credit for pretrial confinement from 29 March through 4 April 1991, and from 1 August through 14 October 1991 based on *United States v. Allen*, 17 M.J. 126 (C.M.A.1984). The judge denied the appellant's motion for additional credit

for illegal confinement during his second period of pretrial confinement based on the asserted violation of the holding in *County of Riverside v. McLaughlin*. We interpret the judge's comments on pages 64 and 65 of the record as a finding by him that *County of Riverside v. McLaughlin* does not apply in the military. For the reasons stated above, we find that the judge's conclusion was erroneous.

Appellant acknowledges that the Government's failure to provide him a timely review after his second period of confinement did not result from any purposeful action by the Government. However, he argues that R.C.M. 305(k) entitles him to three days credit in addition to *Allen* credit already given (based on confinement on 1 August 1991, followed by passage of the 48–hour "deadline" on 4 August 1991, and a magistrate's hearing on 7 August 1991). Brief for Holloway at 11. The Government responds that no additional credit should be given because the Government followed existing regulations, and R.C.M. 305(k) only provides remedies for violations of four cited subsections of R.C.M. 305(k). However, the Government agrees that if we conclude some type of credit is required for a violation of the holding in *McLaughlin*, then day-for-day administrative credit, similar to the formula offered by R.C.M. 305(k), is appropriate, and, since appellant has already served his adjudged confinement, a corresponding reduction in forfeitures should be awarded. Brief for the Government at 18.

We specifically find that the bad-conduct discharge adjudged was appropriate. However, we conclude that appellant should receive some relief from this Court based upon the Government's failure to afford him a prompt probable cause determination after he was confined on 1 August 1991. In our opinion, a day-for-day credit, based on the formula offered by R.C.M. 305(k), is appropriate. Since appellant has served his adjudged confinement, we reassess the sentence on the basis of the error noted, the entire record, and

---

**3.** If R.C.M. 305 is revised in light of *McLaughlin*, it would be useful to have set out those circumstances which would normally rebut the *McLaughlin* presumption.

*United States v. Sales*, 22 M.J. 305 (C.M.A. 1986), and affirm only so much of the sentence as stated below (n.b., our decretal paragraph directs an appropriate reduction in forfeitures intended to reduce the appellant's forfeitures by the equivalent of approximately three days of base pay due a service member in pay grade E–2). *See United States v. Strickland*, 36 M.J. 569, 571 (A.C.M.R.1992), and *United States v. Keith*, 36 M.J. 518, 519 (A.C.M.R.1992), and cases cited therein.

Except as noted above, we conclude that the findings and sentence are correct in law and fact and that no error prejudicial to the substantial rights of the appellant was committed. Accordingly, we reassess the sentence and affirm the findings and only so much of the sentence as extends to confinement for four months, reduction to pay grade E–1, a bad-conduct discharge, and forfeiture of $475 pay per month for four months.

Senior Judges FREYER and STRICKLAND and Judge MOLLISON, concur.

LARSON, Chief Judge (concurring):

I concur but write separately to urge the Court of Military Appeals to re-examine its holding in *Courtney v. Williams*, 1 M.J. 267 (C.M.A.1976) that a commanding officer is not "neutral and detached" for the purpose of making the initial probable cause determination to justify pretrial detention under *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975).

The commanding officer is already required by Article 9, UCMJ, 10 U.S.C. § 809 and Rule for Courts–Martial (R.C.M.) 305(h)(2) to make this very determination before he orders a person into pretrial de-

tention or reviews the order of another authorized official. It is a determination that, by its very nature, demands an objective, rational assessment of the facts. In fact, I do not believe it is even possible to make an honest and sound determination of probable cause in other than a "neutral and detached" manner. Therefore, it makes little sense for Congress and the President to trust a commanding officer with this discretion on the one hand while the appellate courts build in automatic distrust of his ability to be "neutral and detached" on the other.[1]

It makes even less sense when one considers that a commanding officer is granted similar authority in the search and seizure arena, one that is also of constitutional dimension. This authority requires him to, in effect, balance the needs of the unit against the privacy interest of the individual by determining that probable cause exists before authorizing a search. Mil. R.Evid. 315(d). If he is "neutral and detached" when determining probable cause to search, why is he not when determining probable cause to confine?[2] Yet, this is the inconsistency that *Courtney* and R.C.M. 305, in combination, have brought us.

This is not to say that the commanding officer's probable cause determinations should not be subject to review. On a given day, a particular commanding officer may abandon his "neutral and detached" role and order pretrial detention without probable cause. The President has built corrective measures into the Manual for Courts–Martial to cover this situation—review by another officer under R.C.M. 305(i) and by a military judge under R.C.M. 305(j). However, the existence of those

---

1. The reason given in the Manual for Courts–Martial Analysis for R.C.M. 305(h) is to afford the commanding officer an opportunity to build a record for the reviewing officer under R.C.M. 305(i). While this may be one objective—one that could no doubt be accomplished by other means—I suspect that the principal goal of R.C.M. 305(h) is to establish a procedure by which a commanding officer can ensure that the requirements of Article 9, UCMJ and R.C.M. 304 have been met when one of his or her personnel is confined.

2. In fact, this inherent distrust seems particularly insupportable when one considers the awesome responsibility for lives and property that our Nation places on a commanding officer. He or she is required to rise above the emotional fray of the moment and exercise sound rational judgment in balancing the often conflicting interests of unit and individual in a myriad of non-legal matters on a daily basis.

measures, which provide an excellent means to correct abuses, should not be read to render the original probable cause determination by the commanding officer constitutionally insufficient *per se.* I agree with Senior Judge Jones in his dissent where he concludes that the commanding officer's prompt initial determination of probable cause, along with the review safeguards built into the Manual for Courts-Martial, should satisfy *Gerstein* and *McLaughlin.* Yet, the holding in *Courtney* that a commanding officer cannot serve as a "neutral and detached" judicial officer under *Gerstein* is settled law (*see, e.g., United States v. Lynch,* 13 M.J. 394 (C.M.A.1982); *United States v. Malia,* 6 M.J. 65 (C.M.A.1978)); Manual for Courts-Martial 1984, Analysis, R.C.M. 305(h)), and neither of my dissenting brothers faces this point squarely or effectively. Consequently, unless and until the Court of Military Appeals reconsiders its position in that case, I am bound by precedent to concur with the majority.

Senior Judge JONES, joined by Judges REED and LAWRENCE, dissenting:

The majority opinion mechanically forces a doctrine arising in a civilian context upon military cases already imbued with constitutionally sufficient protections provided by the President. *See generally United States v. Lopez,* 35 M.J. 35 (C.M.A.1992) (Cox, J., concurring with modest reservations). It misapplies a constitutionally based "48-hour timeline" required of probable cause determinations to the related but separate military due process right to the review of the commander's determination of the necessity for pretrial confinement. Having misapplied the law, it is but a quick jump to the obvious but incorrect conclusion that the seven-day period envi-

sioned by Rule for Court–Martial 305(i) for review of that determination is constitutionally infirm.[1]

I

Private First Class Jonathan Holloway absented himself three times over the course of 20 months, for a total time of absence of approximately 18 months. The most lengthy absence (nearly 15 months) was terminated by apprehension. After his third absence, which ended on 1 August 1991, PFC Holloway was ordered into pretrial confinement. A hearing to determine whether he should remain in pretrial confinement was held on 7 August 1991. The initial review officer acting under R.C.M. 305(i) determined that PFC Holloway should remain in confinement, and he did so until the trial date of 15 October 1991.

At his special court-martial, PFC Holloway asked the military judge to grant him credit for what he characterized as an illegal detention period between 3 August and 7 August, although he did not contest the legality of the initial determination to confine him. He claimed that *County of Riverside v. McLaughlin,* —— U.S. ——, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991), required the initial review officer hearing described in R.C.M. 305 to be held within 48 hours of his confinement, rather than the seven days currently specified by the rule.

The majority today has held that the initial review officer hearing must be held within 48 hours of confinement. Basing its decision on its interpretation of *McLaughlin,* and following the lead of the Army Court of Military Review in *United States v. Rexroat,* 36 M.J. 708 (A.C.M.R.1992), the Court today has effectively amended the Rules for Courts–Martial and thus usurped the President's power. Because I believe

---

1. The culprit behind what I believe to be a misapplication of the law by the majority and concurring opinions is the specified issue itself. Since I planted the seed of concern that germinated this specified issue springing from my panel, I bear a large measure of responsibility for its creation. But, it is a non sequitur. *County of Riverside v. McLaughlin,* —— U.S. ——, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991), provides us with a working timeline for the prompt post-arrest probable cause determination required by *Gerstein v. Pugh,* 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975); it does no more. It well may be that the military due process principles enunciated in *Courtney v. Williams,* 1 M.J. 267 (C.M.A.1976), require a foreshortening of constitutional underpinnings of *McLaughlin* require corrective action in the military system.

that *McLaughlin* does not require the hastening of the review process that the Court now mandates, I dissent.

## II

The procedures for reviewing pretrial confinement that are now embodied in R.C.M. 305 trace their roots to *Courtney v. Williams*, 1 M.J. 267 (C.M.A.1976). *See* R.C.M. 305 Analysis, App. 21, MCM, 1984. *Courtney*, for its part, was in response to *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975). *See Courtney* at 269–70.

*Gerstein* involved the Florida practice of confining suspects based only upon a prosecutor's information. Under that practice, a person could be arrested without a warrant and charged by information, and then jailed or subjected to other restraints pending trial without *any* opportunity for a probable cause determination. The state defended this practice on the ground that the prosecutor's decision to file an information was itself a determination of probable cause that furnished sufficient reason to detain a defendant pending trial. *Gerstein*, 420 U.S. at 116–17, 95 S.Ct. at 864–65. The Court noted that it was possible then for a suspect to languish "for a substantial period solely on the decision of a prosecutor." *Id.* at 106, 95 S.Ct. at 859.

Two issues were presented for resolution:

> [W]hether a person arrested and held for trial on an information is entitled to a judicial determination of probable cause for detention, and if so, whether the adversary hearing ordered by the District Court and approved by the Court of Appeals is required by the Constitution.

As noted in *Courtney v. Williams*, 1 M.J. at 269–70, the first issue was answered affirmatively:

> [A] policeman's on-the-scene assessment of probable cause provides legal justification for arresting a person suspected of crime, and for a brief period of detention to take the administrative steps incident to arrest. Once the suspect is in custody, however, the reasons that justify dispensing with the magistrate's neutral judgment evaporate. There no longer is any danger that the suspect will escape or commit further crimes while the police submit their evidence to a magistrate. And, while the State's reasons for taking summary action subside, the suspect's need for a neutral determination of probable cause increases significantly.

*Gerstein*, 420 U.S. at 113, 95 S.Ct. at 862.

Soon after the Supreme Court decided *Gerstein*, the Court of Military Appeals had its chance to apply that decision in *Courtney v. Williams*. Courtney sought an extraordinary writ directing his release from pretrial confinement on an assault charge. Already facing a special court-martial for two unauthorized absences, Courtney first sought relief from the trial judge who, having determined that he had no jurisdiction because the offense had not been referred to the special court-martial, denied him review of the pretrial confinement. *Courtney*, 1 M.J. at 269. Although the Uniform Code of Military Justice provided that a person ordering confinement of a servicemember had to make an initial probable cause determination, there was no requirement for any further review of that determination. *Id.* at 270.

As Chief Judge Fletcher made clear in *Courtney*, the *Gerstein* decision requires only that a neutral and detached magistrate determine whether probable cause exists to detain a person. Such a determination that probable cause exists, he explains, only confirms that a person *could* be detained, not that he *should* be detained. Assuming that an accused *could* be detained, the bail procedures in the civilian community would then become applicable. As noted in *United States v. Salerno*, 481 U.S. 739, 766, 107 S.Ct. 2095, 2111, 95 L.Ed.2d 697 (1987) (Marshall, J. dissenting), "[t]he finding of probable cause conveys power to try, and the power to try imports of necessity the power to assure that the processes of justice will not be evaded or obstructed."

Although finding that *Gerstein* itself required no more, the Court of Military Appeals recognized that because bail proce-

dures in the military were absent, some further due process right was necessary.[2]

After the conclusion is reached that one could be detained because of the existence of probable cause, then the next question—whether he should be detained—is all important. A determination to detain has far-reaching consequences, both to the individual and to the potential fairness of the military justice system. [Footnote omitted].

*Courtney,* 1 M.J. at 271.

At the time of the *Courtney* decision, such a due process concern was warranted. Fireman Courtney was afforded no opportunity to contest or otherwise respond to the convening authority's decision to incarcerate him. The Uniform Code of Military Justice provided no procedure for reviewing the probable cause determination that is made by the person ordering arrest or confinement.

While the [Code] provides that probable cause is needed to order arrest or confinement and while it enumerates those persons authorized to arrest or confine, it does not go that next step that is mandated by the Constitution. Although the

confinement officer must report confinement to the confinee's commanding officer within 24 hours after confinement, the Code does not require the commanding officer to take further action. And, the general court-martial convening authority need only review the confinement every 30 days. [Footnotes omitted].

*Courtney,* 1 M.J. at 270.

Thus the *Courtney* court took the *Gerstein* decision one step further to fill the military due process void resulting from the lack of bail procedures.[3]

We believe, then, that a neutral and detached magistrate must decide more than the probable cause question. A magistrate must decide if a person could be detained and if he should be detained. [Footnote omitted].

*Courtney* at 271.

Appellant points us to the Court of Military Appeals' decisions in *United States v. Malia,* 6 M.J. 65 (C.M.A.1978) and *United States v. Lynch,* 13 M.J. 394 (C.M.A.1982) for the principle that the commander qua convening authority is precluded from making the probable cause determination required by *Gerstein.*[4] We disagree. Some-

---

**2.** Discussing *Gerstein,* the U.S. Court of Appeals for the Second Circuit noted, "[i]t would be ironic if a decision rendered to assure a suspect the protection of a neutral magistrate's determination of probable cause after 'a brief period of detention to take the administrative steps incident to arrest' became the basis for extending that detention for weeks or months after the probable cause determination has been made." *United States v. Salerno,* 794 F.2d 64 (1986), *rev'd,* 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). As will be discussed, this concern for extended pretrial confinement in the military is addressed by Rule for Courts–Martial 305.

**3.** After recognizing the nonadversarial nature of the probable cause hearing required in order to detain an arrested person pending further proceedings, Chief Judge Fletcher acknowledged "the additional question before a military magistrate of the propriety of confinement," *United States v. Malia,* 6 M.J. 65, 67 (C.M.A.1978), but concluded that "the initial consideration of pretrial confinement must be immediate and does not necessitate an adversary proceeding." *Id.*

**4.** As discussed above, the Court of Military Appeals has concluded that a court-martial convening authority is disqualified from making the *"pretrial confinement decision,"* Lynch, 13 M.J.

at 397, (as contrasted to the probable cause determination required by *Gerstein* ). This pronouncement originates from the Court's earlier decisions defining the Codal role of the staff judge advocate. The pretrial obligations of the staff judge advocate "inextricably linked [him] to the command function of policing and law enforcement in the military community" and thus placed him in the posture of a prosecutor. *Lynch,* 13 M.J. at 396; *United States v. Hardin,* 7 M.J. 399 (C.M.A.1979). As such, the institutional position of the staff judge advocate was inconsistent with the neutrality and detachment of a pretrial confinement magistrate; moreover, that same institutional position disqualified him as the source of advice to the commander in the latter's pretrial confinement decision. Thus, in *Lynch* an Air Force provision permitting a staff judge advocate to hold the pretrial confinement hearing and then make a recommendation to the special court-martial convening authority as to whether an accused should *remain* in confinement was found constitutionally deficient.

The reasoning is less clear as to why a commander using his independent judgment, not operating under such a regulatory scheme requiring the advice of the staff judge advocate, would be disqualified from making the determination whether an accused remains in pretrial

one other than a judge or lawyer may certainly serve as the "judicial officer" envisioned by the Fourth Amendment so long as he is neutral and detached, and capable of determining whether probable cause exists for the requested arrest or search. No minimal legal or educational qualifications are constitutionally required. *Shadwick v. City of Tampa*, 407 U.S. 345, 92 S.Ct. 2119, 32 L.Ed.2d 783 (1972). Within military practice an impartial commander may certainly authorize a search based on probable cause. M.R.E. 315(d)(1) and (f). We require, however, that one in such a position be neutral and detached in order to impose an orderly process in which that authorizing official is prevented from representing a law enforcement interest while at the same time authorizing searches and seizures. *See generally Lopez*, 35 M.J. 35. The requirement in the Manual that a commander be impartial derives from *United States v. Ezell*, 6 M.J. 307 (C.M.A.1979) and is significant because it recognizes that there is a difference between a commander with his or her various roles and a civilian magistrate. *Lopez*, 35 M.J. at 41.

The Court's concern in those earlier cases of *Malia* and *Lynch* was with the commander as the individual who not only made the pretrial confinement decision, but by default or pursuant to regulation, ultimately determined the legitimacy or justification for pretrial confinement in a given case. As observed in *United States v. Rexroat*, 36 M.J. at 711 n. 1, in most military situations the offending servicemember is apprehended by shore patrol or military police and returned to control of his commander. The commander then determines the charges and the need for pretrial confinement. Accordingly, there *is* a probable cause determination for charges before confinement is authorized.

*Malia*, in pertinent part, held that the confining commander may not overrule the magistrate's decision to release, relying on the similar reasoning of *United States v. Ware*, 1 M.J. 282 (C.M.A.1976) (under Article 62(a), UCMJ, 10 U.S.C. § 862(a), a commander could not reverse the finding of a trial judge but could only return the record to the court for reconsideration of the ruling). In *Lynch*, the Court found an Air Force procedure to be infirm where the special court-martial convening authority was called upon to make the "pretrial confinement decision" because it could not be reconciled with the constitutional requirement that "the detached judgment of a neutral magistrate" must determine whether an accused *remains* in pretrial confinement. *Lynch* at 397 (Everett, C.J. concurring) (emphasis supplied). Whether the commander qua convening authority continues to be disqualified is unclear. "Although a commanding officer cannot be equated to a magistrate, he—like a magistrate—must be 'neutral and impartial' in performing some of his responsibilities. This expectation applies when the commander is issuing search authorizations; and, likewise, when ordering a suspect into confinement, he must act in a neutral capacity." *United States v. Sharrock*, 32 M.J. 326, 333 (C.M.A.1991) (Everett, S.J., concurring in part and dissenting in part).

confinement. Notwithstanding the prosecutorial bent of the staff judge advocate as discussed in *Hardin*, he evaluates an accused's guilt for the purposes of his Article 34(a), UCMJ, 10 U.S.C. § 834(a), advice in terms of whether a charge "is warranted by evidence indicated in the [Article 32] report of investigation." This quantum of evidence is left unspecified in both the Uniform Code of Military Justice and the Manual for Courts–Martial (both 1969 and 1984 versions), but the Court of Military Appeals has stated in *United States v. Engle*, 1 M.J. 387, 389, n. 4 (1976), that "it is that degree of proof which would convince a reasonable, prudent person there is probable cause to believe a crime was committed and the accused committed it. *See Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975)."

In other words, although the staff judge advocate may be institutionally precluded from making or giving advice on the determination to *continue* pretrial confinement, he is not precluded from making the probable cause determination that is the subject of *Gerstein*. Similarly, although the convening authority exercises his pretrial Codal functions in a prosecutorial context, *Hardin* at 404, if he finds or is advised by a judge advocate that there are reasonable grounds to believe that an offense triable by court-martial has been committed and that the accused committed it, and that the preferred specification alleges an offense, he may then refer the charge to trial. Rule for Courts–Martial 601(d)(1).

### III

The significant aspect of *Gerstein* overlooked by the majority is that the Court inferentially distinguished the initial confinement resulting from arrest from any subsequent determination that confinement should be continued, specifically, bail determinations. *See Gerstein*, 420 U.S. at 124, 95 S.Ct. at 868 (the probable cause determination may be incorporated into the procedure for setting bail or fixing other conditions of pretrial release). *Cf. id.* at 114, 95 S.Ct. at 863 ("[e]ven pretrial release may be accompanied by burdensome conditions that effect a significant restraint of liberty [citing Bail Act]"). The decision to continue pretrial confinement simply was not at issue in *McLaughlin*.

*McLaughlin* is concerned solely with the need for a prompt (i.e., 48–hour) determination by an impartial authority of the probable cause to arrest that has led to an individual's being retained in custody. The military already has such a procedure. All would agree that the commander, as in the case of all officers, may direct pretrial confinement. R.C.M. 304(b). But before he may do so, he must conclude that an offense triable by court-martial has been committed and that the accused committed that offense, i.e., the probable cause determination required by *Gerstein*. R.C.M. 305(d)(1) and (2). *Cf. Lopez*. Only then may he determine whether pretrial confinement is warranted by the circumstances. R.C.M. 304(d)(3).

What the majority purports to place at issue here is the timing of the subsequent decision as to whether the member should continue to be confined or be released, the counterpart of the civilian bail setting procedures. Recognizing the needs of the state in the orderly administration of justice, *Gerstein* permitted the states to delay the probable cause determination until some subsequent stage in the process, e.g., either the suspect's first appearance before a judicial officer, or arraignment, or other session for the purpose of setting bail or conditions of pretrial release. 420 U.S. at 124–25, 95 S.Ct. at 868–69. But such a

determination had to be "promptly after arrest," *id.* at 125, 95 S.Ct. at 869, a promptness now defined as 48 hours.

Through the implementation of R.C.M. 305, the President has elected not to defer the probable cause determination mandated by *Gerstein*. Instead, it is made *prior* to the decision to confine. The commander, himself, is normally the individual to make that initial determination to confine and there is no reason in law or policy that he should not do so. *See Sharrock*, 32 M.J. at 334 (Cox, J., concurring in part and concurring in the result) (pretrial confinement [is] but an extreme form of apprehension). "[I]t must be remembered that a commanding officer has the duty to maintain law and order and to protect the welfare, health, well-being, and safety of the command." *Lopez*, 35 M.J. at 44 (Cox, J., concurring). If another has directed that confinement, the commander is required to be notified within 24–hours. R.C.M. 305(h). Even in the somewhat unusual event that he is not the individual who initially made the probable cause determination and decision that confinement was warranted, the commander must, within 72–hours after receiving notice of confinement, make his own independent decision as to whether pretrial confinement should continue. R.C.M. 305(h)(2)(A). The commander must then direct the prisoner's release from pretrial confinement unless, again, he concludes that there is probable cause for the apprehension of the accused and that continued confinement is necessary. R.C.M. 305(h)(2)(B). An extensive list of factors is provided to focus the commander's consideration of those issues. *Id.* *See also* Discussion. The commander must then prepare a written memorandum stating the reasons for his conclusions of probable cause and the need for confinement. R.C.M. 305(h)(2)(C). That memorandum is then provided to the reviewing officer, a neutral and detached officer as required by R.C.M. 305(i), who within seven days must review the commander's determination of probable cause and his determination that pretrial confinement is necessary.[5]

---

**5.** Following confinement, an accused shall be informed promptly of the charges against him,

Where the commander first undertakes the determination required by R.C.M. 305(d) and (h) as a neutral and detached official, and concludes that the test for probable cause is met, he has done all that *Gerstein* and *McLaughlin* require. He then, appropriately, may make the initial determination as to whether pretrial confinement is necessary, R.C.M. 305(d)(3) and (h)(2)(B), by virtue of his responsibility to protect the good order and safety of his command.

> [T]he real initial decision for pretrial confinement [lies] with the prisoner's commander. Although the immediate commander may not be a neutral and detached official for pretrial confinement purposes,[6] it is appropriate to give this officer the initial decision on pretrial confinement, so that the command implications of this determination may be fully considered and developed for further review. This will enable the commander, who is in the best position to assess the predictive elements of the pretrial confinement decision, including not only the prisoner's likely behavior, but also the impact of release or confinement on mission performance, to make a record of such factors for the initial review. (Citations omitted).

Rule for Courts–Martial 305(h), Analysis, A21–15, MCM, 1984.

his right to remain silent, and his right to retain civilian counsel or request assignment of military counsel. If requested, military counsel are to be provided to the prisoner before the review contemplated under R.C.M. 305(i). R.C.M. 305(e), (f). The prisoner and his counsel shall be allowed to appear before the reviewing officer and make a statement, if practicable. R.C.M. 305(i)(3)(A). The reviewing officer's conclusions, including the factual findings on which they are based, shall be set forth in a written memorandum. R.C.M. 305(i)(6). The prisoner may petition the review officer for reconsideration of his decision to confine based upon information not previously considered. R.C.M. 305(i)(7). Upon referral of charges, the military judge shall review the propriety of pretrial confinement upon motion for appropriate relief. R.C.M. 305(j). Finally, the prisoner is credited day for day against his adjudged confinement for each day of pretrial confinement served as a result of an abuse of discretion or of a failure to comply with subsections (f), (h), or (i) of the rule. Such credit is in addition to any

Only where the commander is not the individual initially directing confinement, and thus operating under the 72–hour obligations imposed by R.C.M. 305(h), are the standards of *McLaughlin* arguably not met. In such cases, if one were to assume that the President erred by 24 hours in assessing the liberty interest of the individual in the context of the practical realities of military society, then one would have to conclude that the commander's decision itself required under that rule could occur no later than 48 hours after confinement has been imposed. No requirement exists, however, that should then compel the commander to submit the written memorandum supporting his determination, R.C.M. 305(h)(2)(C), any earlier than existing practice.

### IV

The federal system, unlike the military, has a bail procedure, contained in the Bail Reform Act of 1984. *See* 18 U.S.C. §§ 3141 *et seq.* (1987 Supp. V). In upholding that Act's provisions permitting pretrial detention on the basis of future dangerousness, the Supreme Court has engaged in a weighing process, balancing the Government's interest in preventing crime by arrestees against the individual's strong interest in liberty.[7]

credit given under *United States v. Allen*, 17 M.J. 126 (C.M.A.1984).

6.  As discussed earlier, "for pretrial confinement purposes" in this context means only that the commander is disqualified by decisional law from serving as the final authority on the question of the need or justification, and ultimately, the legitimacy of pretrial confinement.

7.  As recognized by the Supreme Court in *Gerstein*, 420 U.S. at 114, 95 S.Ct. at 863, "[p]retrial confinement may imperil the suspect's job, interrupt his source of income, and impair his family relationships." We hasten to point out that the fiscal concerns of the Court would be diminished in the military context. A pretrial confinee continues as a fully compensated member of the service to and through trial and until the convening authority approved a sentence affecting an accused's financial state. We also have no hesitation in commending the relative safe and secure environments of our Navy brigs and other military confinement facilities

We do not minimize the importance and fundamental nature of this right. But, as our cases hold, this right may, in circumstances where the government's interest is sufficiently weighty, be subordinated to the greater needs of society. We think that Congress' careful delineation of the circumstances under which detention will be permitted satisfies this standard.

*Salerno,* 481 U.S. at 750–51, 107 S.Ct. at 2103.

In concluding that the Act was not facially invalid under the Due Process Clause of the Fifth Amendment, the Court, after identifying the substantial procedural protections [8] afforded an individual under the Act, noted that those protections "far exceed[ed] what we found necessary to effect limited postarrest detention in *Gerstein v. Pugh.*" In other words, these heightened procedures were sufficient to justify the state's interest in further confining an accused. This is precisely what the President has accomplished with the promulgation of R.C.M. 304 and 305. A continuum of rights is thus provided the pretrial confinee in both military and civilian settings, from the probable cause assessment of the arrest/apprehension made by the neutral and detached judicial officer (civilian magistrate and commander) to the bail proceedings of the federal system and the confinement review procedures of the military.

Under the Bail Reform Act,

> The hearing shall be held immediately upon the person's first appearance before the judicial officer unless that person, or the attorney for the Government, seeks a continuance. Except for good cause, a continuance on motion of the person *may not exceed five days,* and a continuance on motion of the attorney for the Government *may not exceed three days.* During a continuance, such person shall be detained.... The person may be detained pending completion of the hearing.

18 U.S.C. § 3142(f) (emphasis supplied).

In the only Supreme Court case to review the timing of the hearing, *United States v. Montalvo–Murillo,* 495 U.S. 711, 110 S.Ct. 2072, 109 L.Ed.2d 720 (1990), the granted issue was whether a magistrate's own motion to postpone the hearing, which resulted in the defendant's being held over ten days before his first appearance before the magistrate, warranted the defendant's release. The Court noted that a prompt hearing is necessary, and that the Act's time limitations must be followed with care and precision. *Id.* at 716, 110 S.Ct. at 2077. Montalvo–Murillo argued that because the statute required a hearing at a specific event, and did not permit the continuance the magistrate took, the Government was barred from seeking pretrial detention. *Id.* at 718, 110 S.Ct. at 2078. The Court rejected that argument, stating that it did not

> agree that we should, or can, invent a remedy to satisfy some perceived need to coerce the courts and the Government into complying with the statutory time limits.

*Id.* at 721, 110 S.Ct. at 2079.

The Court's declination to craft a remedy for delay in a case involving the Bail Reform Act supports the position that the well delineated time limits and procedures of R.C.M. 304 and 305 are also constitution-

in contrast to their civilian counterparts. Lastly, we note that the liberty interest of a sailor or marine, in comparison to his civilian brother or sister, is qualified by the very nature of his or her military duties. *Cf. Schall v. Martin,* 467 U.S. 253, 264, 104 S.Ct. 2403, 2409, 81 L.Ed.2d 207 (1984).

8. Detainees have a right to counsel at the detention hearing. 18 U.S.C. § 3142(f). They may testify in their own behalf, present information by proffer or otherwise, and cross-examine witnesses who appear at the hearing. *Id.* The judicial officer charged with the responsibility of determining the appropriateness of detention is guided by statutorily enumerated factors, which include the nature and the circumstances of the charges, the weight of the evidence, the history and characteristics of the putative offender, and the danger to the community. Sec. 3142(g). The government must prove its case by clear and convincing evidence. Sec. 3142(f). Finally, the judicial officer must include written findings of fact and a written statement of reasons for a decision to detain. Sec. 3142(i). The Act's review provisions, Sec. 3145(c), provide for immediate appellate review of the detention decision. *Salerno,* 481 U.S. at 751–52, 107 S.Ct. at 2103–04.

ally valid. Not surprisingly, in the only post-*McLaughlin* case we have found that addresses the holding in *Montalvo–Murillo,* there is no suggestion that the time lines of the Bail Reform Act, or even their breach, would be violative of the "48–hour" rule. *United States v. Gotti,* 776 F.Supp. 666 (E.D.N.Y.1991).

The American Bar Association Standards, Pretrial Release Sec. 10–4.2. (Rev. 1985) lends additional support for such a position. A preceding section, 10–4.1, provides that a defendant should be taken before a judicial officer without unnecessary delay, which except during nighttime, is defined as within six hours of arrest. Notwithstanding such an interest in a prompt first appearance exceeding even that of *McLaughlin,* Standard 10–4.2 was amended in 1985 to adopt procedures for the imposition of preventive detention. Analysis, Standard 10.4.2, "Nature of First Appearance." Under the change, if, at the first appearance, the prosecuting attorney files a written notice of intent to seek preventive detention, a judicial officer should be authorized, after finding probable cause to believe that the defendant has committed a predicate felony for preventive detention as alleged in the charging document, to order provisional preventive detention for a period that may not exceed three calendar days. "This meets the constitutional requirements laid down by the Supreme Court in *Gerstein v. Pugh,* 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975)." *Id.* In other words, without more, upon motion by the Government, an accused may be held an additional three days so long as the judicial officer has reached the probable cause determination required by *Gerstein;* no consideration of the need for the initial pretrial confinement or even continued pretrial restraint is even addressed.

V

In conclusion, "[t]here is no single preferred pretrial procedure, and the nature of the probable cause determination usually will be shaped to accord with a State's pretrial procedure viewed as a whole." *Gerstein,* 420 U.S. at 123, 95 S.Ct. at 868. From appellant's point of view, a determination of the need for continued pretrial confinement at the 48–hour, rather than the seven-day, mark, is certainly preferable,[9] "[b]ut our federal system warns of converting desirable practice into constitutional commandment." *Shadwick,* 407 U.S. at 353, 92 S.Ct. at 2124. The President has created a two-tiered system of protection for pretrial detainees. In doing so, he has implemented Congressional will (*see* 10 U.S.C. §§ 809 and 810) and complied with the mandates of both the Court of Military Appeals and the United States Supreme Court. Because I believe the issue in *McLaughlin* to be one of probable cause to arrest leading to *initial* pretrial detention, and not one of *continued* pretrial confinement following the "brief period of detention to take the administrative steps incident to arrest,"[10] I dissent.

Judge LAWRENCE, joined by Senior Judge ORR, dissenting:

I dissent from the majority's holding that *County of Riverside v. McLaughlin,* —— U.S. ——, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991), mandates a change in Rule for Courts–Martial (R.C.M.) 305 on the fundamental ground that *McLaughlin* is not binding precedent concerning the issue before us. I would hold that the President's rule contained in R.C.M. 305, promulgated pursuant to congressional authority in Article 36, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 836, does not violate

9. Appellate defense counsel within their brief and at oral argument take a position based on policy considerations that implementation of a "48–hour rule" will not prove impracticable. We do not agree. By example, they suggest that the requirement for a R.C.M. 305 hearing is not triggered until a geographically displaced servicemember is returned to his command and ordered into confinement: such is not clear to us. Would not the military member be entitled

to a *McLaughlin*-dictated hearing when confined in a civilian jail awaiting pickup by the military? *Cf. United States v. Allen,* 17 M.J. 126 (C.M.A. 1984) (accused entitled to sentence credit for pretrial confinement). As an accused were moved between military confinement facilities en route to his parent command, would not such a hearing be required?

10. *Gerstein,* 420 U.S. at 114, 95 S.Ct. at 863.

the Fourth Amendment to the U.S. Constitution as that amendment applies to the military services.

Federal civilian precedent regarding the Fourth Amendment to the U.S. Constitution has never been applied so mechanically to military society as the majority does in this case without any extended discussion of the obviously differing balances between societal needs for safety and order and individual liberty interests that divide the two societies. R.C.M. 305 is based on years of military experience with several military magistrate programs. It results from a balance in military society between the government's interest to ensure tranquility and public safety and the individual's interest in personal freedom that is radically and demonstrably different from the balance struck by the Supreme Court in *McLaughlin*. The majority err because they apply *McLaughlin* to military practice and procedure without considering the essential facts and factors that generated the holding of *McLaughlin*. The rationales for both the *McLaughlin* majority's 48–hour presumption and the dissent's 24–hour rule simply do not pertain logically to military society in general and the facts of this case in particular.

This Court's analysis should focus on the pertinent constitutional, statutory, and regulatory provisions that bear on this issue and the marked realities of military necessity and life that vary immensely from those in civilian society. The majority simply ignore these complexities and summarily conclude that because in 1976 the Court of Military Appeals in *Courtney v. Williams*, 1 M.J. 267 (C.M.A.1976), mechanically applied *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), to military practice, we are bound to do likewise with *McLaughlin* in 1993. To me, the majority provide no compelling rationale for overturning a rule which reflects military exigencies and the unique aspects of military society and organization and was promulgated by the President, pursuant to unquestionable constitutional authority, based on extensive experience and data.

## I. GENERAL APPLICATION OF FOURTH AMENDMENT PRINCIPLES TO MILITARY JUSTICE

The Supreme Court "has long recognized that the military society is, by necessity, a specialized society separate from civilian society." *Parker v. Levy*, 417 U.S. 733, 743, 94 S.Ct. 2547, 2555, 41 L.Ed.2d 439 (1974); *see also Orloff v. Willoughby*, 345 U.S. 83, 94, 73 S.Ct. 534, 540, 97 L.Ed. 842 (1953) ("The military constitutes a specialized community governed by a separate discipline from that of the civilian."). Because of this special status, the Supreme Court has "also recognized that the military has, again by necessity, developed laws and traditions of its own during its long history." *Levy*, 417 U.S. at 743, 94 S.Ct. at 2555. This "military law ... is a jurisprudence which exists separate and apart from the law which governs in our federal judicial establishment." *Burns v. Wilson*, 346 U.S. 137, 140, 73 S.Ct. 1045, 1047, 97 L.Ed. 1508 (1953), *quoted in Schlesinger v. Councilman*, 420 U.S. 738, 746, 95 S.Ct. 1300, 1307, 43 L.Ed.2d 591 (1975). The "laws and traditions governing [military] discipline have a long history; but they are founded on unique military exigencies as powerful now as in the past. Their contemporary vitality repeatedly has been recognized by Congress." *Councilman*, 420 U.S. at 757, 95 S.Ct. at 1313.

Thus, in general, differences between civilian and military law and procedure are not only constitutionally permissible, they are expected to exist. Although the Supreme Court has remanded cases to the Court of Military Appeals with direction to consider a cited Supreme Court decision, *see United States v. Lopez*, 35 M.J. 35, 48 (Sullivan, C.J., concurring in the result), the Supreme Court has never presumed the application of civilian law to the military; certainly no precedent even suggests that a majority of that Court presume the application of its Fourth Amendment holdings to military society.

In 1960, after considerable scholarly debate, the Court of Military Appeals nonetheless declared that the "protections in the Bill of Rights, except those which are ex-

pressly or by necessary implication inapplicable, are available to members of our armed forces." *United States v. Jacoby,* 11 C.M.A. 428, 430–31, 29 C.M.R. 244, 246–47, 1960 WL 4489 (1960); *see United States v. Ezell,* 6 M.J. 307, 313 (C.M.A.1979). By its terms, however, the Fourth Amendment bears only remotely on military society. It begins by recognizing the right of the people to be secure in their persons, houses, papers, and effects, yet clearly in the late 1700's the "people" referred to did not include soldiers or sailors in active federal service. Soldiers and sailors had no such right, as the drafters of the amendment were well aware. Further, the amendment prohibits the issuance of warrants without probable cause. Military authorities did not then nor do they now issue warrants to search or seize persons or property in the military services. Searches and seizures in general, and confinement of service personnel in particular, were the sole prerogative of the military commander for the first 185 years of our existence as a sovereign nation. That commander authorized searches and seizures and ordered service personnel into, as well as released from, confinement. Not until the UCMJ did military statutory law and practice even require that the order for pretrial confinement be based on probable cause. The very language of the Fourth Amendment seems unrelated to military traditions, practice, and law, and military appellate decisions since *Jacoby* demonstrate how poorly Fourth Amendment principles taken from civilian life fit military requirements and interests.

After more than two decades of experience in trying to apply Fourth Amendment principles to military society, the Court of Military Appeals acknowledged that the "Fourth Amendment does not take into account the exigencies of military necessity and unique conditions that may exist in military society." *United States v. Middleton,* 10 M.J. 123, 127 (C.M.A.1981). Certainly in the realm of search and seizure, the Court has recognized "four major variances from conventional Fourth Amendment doctrine," that is, there is no military requirement that a search authorization be made by a judicial officer, the search au-

thorization need not be in writing, the authorization need not be supported by an oath or affirmation, and pervasive military inspections may be ordered without probable cause or a warrant. *See Lopez,* 35 M.J. at 45 (Cox, J., concurring). Indeed, military exigencies are so pronounced that it is now very doubtful that any presumption that Supreme Court Fourth Amendment precedent applies to military law and practice continues to exist. *See Lopez,* 35 M.J. at 41 n. 2 (plurality opinion), at 42–43 (Cox, J., concurring).

Those military exigencies and unique conditions in the military to which the *Middleton* Court referred "result from 'the primary business of armies and navies to fight or be ready to fight wars should the occasion arise.'" *Lopez,* 35 M.J. at 41 (quoting *United States ex rel. Toth v. Quarles,* 350 U.S. 11, 17, 76 S.Ct. 1, 5, 100 L.Ed. 8 (1955)). The nature of this business requires a highly trained force comprised of motivated and disciplined persons who generally must be willing to forego their personal interests for those of the force and the unit. A key component in ensuring such a force is labeled the maintenance of good order and discipline. Crime, disorder, or insubordination that civil society may accept as a consequence of personal freedom is intolerable in military society. Criminals, the undisciplined, and the insubordinate must be removed swiftly and effectively from the unit and close proximity to their peers, otherwise their example will adversely affect unit cohesion and infect others who but for their example will generally perform acceptably. Thus, military society "must insist upon a respect for duty and a discipline without counterpart in civilian life." *Councilman,* 420 U.S. at 757, 95 S.Ct. at 1313.

No Fourth Amendment balancing between governmental interests and those of the ordinary citizen by a civilian court takes into account this recognized, exceptional interest of the military commander who is responsible for the training, discipline, and military effectiveness of his force and therefore must possess an authority over the freedom of servicemem-

bers that is virtually without parallel in civilian society. Indeed, one appellate judge, analyzing generally military decisions concerning search and seizure, observed:

> The essence of my disagreement with the way search and seizure law applies to military society is that we have tried to adopt rules that superimpose into the military various Fourth Amendment concepts fashioned by the Supreme Court for civilian society. These rules generally have no applicability to the relationship of a *commander to members of his command....*

*United States v. Morris*, 28 M.J. 8, 18 (C.M.A.1989) (Cox, J., concurring in part and dissenting in part) (emphasis added).

Certainly, if given a meaningful choice, few servicemembers would choose significant restrictions on their personal liberty. Reasonable, dedicated servicemembers recognize, however, that a necessary result of military exigencies is that their rights "must perforce be conditioned to meet certain overriding demands of discipline and duty." *Levy*, 417 U.S. at 744, 94 S.Ct. at at 2556. One right that is severely limited by necessity is the right to privacy. In virtually every military work or living environment, military inspections are routine, expected, and generally thorough. Life in barracks, on ships, in the field, and on controlled military bases is collective, and the actions of individuals are so interdependent that the right to privacy is truncated indeed. Soldiers and sailors regularly live, sleep, bathe, and perform personal bodily functions in close proximity under conditions that most civilians would find embarrassing if not demeaning.

Similarly, the right of freedom of movement in the military, the liberty to go where a person wishes when he or she wishes, is a faint shadow of that enjoyed in civilian life. Servicemembers are not entitled to regular working hours and may be ordered to stand watches or work or train at night or on weekends. Routinely, required duties take them away from their immediate families, often for weeks or months. The servicemember who receives an order affecting his freedom of movement is not free to decline it by quitting his job no matter how dangerous, unpleasant, or inconvenient compliance may be. So long as the order is related to a military duty, in general, servicemembers must be where they are ordered for so long as they are ordered—even a "dress code" is prescribed. These restraints on personal freedom would be intolerable to the ordinary citizen, yet they are accepted as a normal incident of military service to those who understand their necessity.

## II. PROTECTION OF RIGHTS OF PRE-TRIAL CONFINEES BY CONGRESS AND THE PRESIDENT

Congress, the branch of government primarily charged with balancing the needs of the commander against those of the individual servicemember, has considered the foregoing, *see A Bill to Unify, Consolidate, Revise, and Codify the Articles of War, the Articles for the Government of the Navy, and the Disciplinary Laws of the Coast Guard, and to Enact and Establish a Uniform Code of Military Justice: Hearings on H.R. 2498 Before a Subcommittee of the Committee on Armed Forces, House of Representatives*, 81st Cong., 1st Sess. 901–23 (1949) [hereinafter *House Hearings*], and has enacted legislation that as much as is practicable protects the liberty interests of a servicemember who is accused of an offense. As early as 1920, Congress amended the Articles of War so that pretrial confinement was no longer mandatory for enlisted persons awaiting court-martial. By the 1940's, both the Army and the Navy had in practice adopted a probable cause standard to permit confinement of an accused prior to trial; this standard became law in 1950 with the passage of Article 9(d), UCMJ, 10 U.S.C. § 809(d). Article 10, 10 U.S.C. § 810 embodied previous Army and Navy provisions requiring immediate steps to inform a pretrial confinee of the offense for which he is confined and "to try him or to dismiss the charges and release him." Congress intended that Article 10 be enforced through Article 98, 10 U.S.C. § 898 which makes it a punishable offense to

unnecessarily delay the disposition of any case of a servicemember accused of violating the UCMJ. *House Hearings* at 903. Article 11, 10 U.S.C. § 811 continued previous provisions requiring that within 24 hours of the imposition of pretrial confinement the commanding officer shall be notified of the name of the prisoner, the offense, and the person ordering confinement. Finally, Article 13, 10 U.S.C. § 813 extended reforms in pretrial confinement contained in the 1948 redraft of Article of War 16 by remedying previous abuses of pretrial confinement. Article 13 prohibited the punishment of any pretrial confinee for the offenses of which he is confined and further mandated that the conditions of confinement be no more rigorous than the circumstances required to ensure his presence for trial.

Even before the present Manual for Courts–Martial, the President, as Commander-in-Chief and acting under his Article 36 rule-making authority, had enacted regulations concerning the imposition of pretrial confinement. The 1951 Manual for Courts–Martial made clear that "[n]o restraint need be imposed in cases involving minor offenses." Manual for Courts–Martial, United States (MCM), 1951, ¶ 18b. The 1951 MCM also permitted pretrial confinement for two reasons only: (1) to ensure the accused's presence at trial, and (2) because of the seriousness of the offense. MCM, 1951, ¶ 20c. The 1969 MCM granted pretrial confinees additional protection by prohibiting punitive labor, punitive duty or training, and special uniforms for pretrial confinees that are prescribed for post-trial confinees. MCM, 1969 (Rev.), ¶ 18b(3). Thus, when *Courtney* was decided, it was clear that both Congress and the President had examined the subject of imposition of pretrial confinement in the military services in great depth.

## III. PRETRIAL CONFINEMENT POST-COURTNEY TO R.C.M. 305

In 1975, the Supreme Court decided *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975). In 1976, in *Courtney v. Williams*, 1 M.J. 267 (C.M.A.1976), the Court of Military Appeals summarily ap-

plied the *Gerstein* holding to military practice and procedure. It noted that although the commanding officer must receive a report within 24 hours after confinement, "the Code does not require the commanding officer to take further action. And, the general court-martial convening authority need only review the confinement every 30 days." *Courtney*, 1 M.J. at 270. Obviously, that perceived omission in the UCMJ was remedied in R.C.M. 305 by requiring the commanding officer to make a probable cause determination promptly after being informed that another authority had ordered an accused into pretrial confinement. The Court went on to require that a "neutral and detached magistrate" make a probable cause determination *and* a decision whether pretrial confinement should be continued. This latter requirement of course involves information that generally is unrelated to the existence of probable cause and which may be obtainable only from sources located away from the situs of the alleged offense or the place of confinement.

In response to *Courtney*, each military service and the Coast Guard initiated a military magistrate program. *See generally* Jack E. Owen, *A Hard Look at the Military Magistrate Pretrial Confinement Hearing: Gerstein and Courtney Revisited*, 88 Mil.L.Rev. 3, 40–47 (1980) (listing time requirements for initial review and probable cause hearings under service regulations in effect the first few years after *Courtney* and arguing for uniformity between the services). It is important to review these programs briefly because the combined experience gained through their operation throughout the world was used by the Working Group of the Joint–Service Committee and the Code Committee in drafting R.C.M. 305.

The Army military magistrate program was contained in Army Regulation (AR) 27–10. The person ordering pretrial confinement was required to forward information forming the basis for the decision to confine, along with a checklist, to the military magistrate, a judge advocate, who was required to review all documents and inter-

view the confinee within 7 days after initiation of pretrial confinement. After this initial probable cause review and determination that continued pretrial confinement was justified, the magistrate was required to review each case every 2 weeks.

The program in the Naval Service was set forth in Secretary of the Navy Notice 5810 and Secretary of the Navy Instruction 1640.10. In the Navy, the magistrate had to be a judge advocate; in the Marine Corps, he did not. Within 72 hours after ordering pretrial confinement, the confining authority was required to forward detailed information to the magistrate to support the probable cause determination and the necessity for continued pretrial confinement. After receipt of this information, the magistrate was to hold an informal hearing "promptly" to review the probable cause determination and to decide whether continued confinement was justified. In cases of pretrial confinement arising at sea, the commanding officer was required to transfer the confinee to a shore confinement facility as soon as practicable. The detailed information described above to constitute probable cause and justify continued confinement had to be forwarded within 24 hours after transfer to the shore facility. Thereafter, procedures remained the same.

In the Air Force, pursuant to Air Force Manual No. 111–1, an informal hearing to determine probable cause and whether confinement should be continued was to be held within 72 hours of initiation of confinement. The hearing officer was either the officer exercising special court-martial jurisdiction (OESPCMJ) or a designated staff judge advocate who was permitted to hold the hearing and then make a recommendation to the OESPCMJ. Portions of this program were overturned in *United States v. Lynch,* 13 M.J. 394 (C.M.A.1982).

The Coast Guard program set forth in Coast Guard Manual No. CG–488, the Military Justice Manual, mandated a probable cause review and independent decision on continuation of confinement within 72 hours after the order to confine. The magistrate could be a non-lawyer.

In summary, after initiation of pretrial confinement, probable cause and continuation hearings could occur 7 days after confinement in the Army, "promptly" after 72 hours of confinement in the Navy and Marine Corps, and within 72 hours after confinement in the Air Force and Coast Guard. Military requirements for the hearing thus ran from 3 to 7 days.

From 1976–77 until 1984 when R.C.M. 305 was promulgated, thousands of magistrate hearings were held, and program changes were made in light of this extensive experience. Those administering and participating in these programs learned the practical difficulties of conducting such hearings in the real world of frequent unit deployments and movements, location of forces overseas and in remote areas, and limited legal resources. This experience became the background for the provisions of R.C.M. 305.

## IV. THE CURRENT RULE AND THE RATIONALE BEHIND IT

I will not reiterate the specific provisions of R.C.M. 305 since Senior Judge Jones does so in his dissent. Two major aspects of the rule must be emphasized, however. First, if the commander is the authority initially ordering pretrial confinement, he has already determined that probable cause exists since Article 9(c) mandates that standard. In this situation, within 72 hours the commander must review his decision and determine anew, based on all facts and circumstances existing at the time of the initial order and developed after that decision, whether probable cause exists and whether under all the facts and circumstances confinement should continue. If he is not the authority that initiated the confinement, within 72 hours of receiving the report of confinement, he must determine *de novo* whether probable cause exists and confinement should continue. Although I agree fully with dissenting Senior Judge Jones that the commander's probable cause determination should, in the military setting, satisfy the rule of *Gerstein* and *McLaughlin,* I will assume *arguendo* that it does not and continue my separate

explanation of the reasons why *McLaughlin*'s holding does not apply to the military.

Second, the commander's determination is reviewed by a neutral and detached magistrate not more than 7 days after the initiation of confinement. The magistrate reviews the information that had been before the commander and the commander's basis for his decision to continue confinement as well as any information developed after the commander's decision.

The Analysis to R.C.M. 305 sets forth the drafter's basis for the rule as well as the factors that were balanced in coming to its express terms. The Analysis, written by the Working Group of the Joint-Service Committee, begins by providing an explanation of the general balancing of factors and interests that resulted in the specific aspects of the rule. This balancing cannot be overly emphasized.

> The Working Group considered various procedural mechanisms for imposition and review of pretrial confinement. Numerous practical, as well as legal, concerns were analyzed and weighed in striking a balance between individual liberty and protection of society. The Working Group proceeded from the premise that no person should be confined unnecessarily. Neither the prisoner *nor the government benefits* from unnecessary confinement. On the other hand, in determining when confinement may be necessary, the nature of the military and its mission is an important consideration. Moreover, some of the collateral impact associated with pretrial confinement in civilian life (loss of job, income, and access to defense counsel) is normally absent in the military setting and pretrial confinement is seldom lengthy. *See* R.C.M. 707 [120–day rule for pretrial confinement]. Finally, the procedures for imposition and review of pretrial confinement had to be compatible with existing resources.

MCM, 1984, Analysis, R.C.M. 305, *Introduction*, App. 21, at A21–14.2 (emphasis added).

The Working Group pointed to an obvious distinction between pretrial confinement in the military and in civilian life. The consequences of pretrial confinement to the military member bear no real or meaningful relationship to that of a civilian at all—indeed, they pale by comparison. The military pretrial confinee goes into a local brig generally at or near his duty station. His pay and allowances continue unabated, therefore, his personal and household bills continue to be paid, the house continues to provide shelter, and food continues to arrive on the family table. He wears regular military uniforms. He receives medical care from the same facility as do unconfined service members. Such confinees may have visitors. Conjugal visits are foreclosed, but simple pretrial restriction and normal deployments have the same result. The accused's defense counsel can easily visit or communicate with his or her client. I have been involved closely with military justice and brigs for about 18 years. Naval brigs are clean and well-managed. Assaults upon prisoners by guards or other inmates are exceedingly rare. In my opinion, whether innocent or not, any thinking pretrial confinee would gladly remain in a military facility for 7 days before a probable cause hearing rather than doing 48 hours in a civilian jail in New York City or Detroit.

Of special note is the emphasized portion of the Analysis which points out an important fact of military command. Unlike the civilian prosecutor, police officer, or booking sergeant in a police station, the commander has a real and substantial interest in *not* confining an accused, even if probable cause does exist. A confined "body" is lost to the unit. That squad leader, machine gunner, flight deck member, or radar operator is not available for deployment, an exercise in which the commander wants his unit to meet its mission and look good, or even for routine watchstanding where some other unit member must cover the confinee's duties. The delay in holding the magistrate's hearing inherent in allowing the commander to make his own decision of probable cause and whether confinement should continue is fully justified, in my

opinion, since this stage affords an accused a real opportunity to be released from confinement for reasons unrelated to probable cause or other facts which would normally justify continued confinement.

The Analysis goes on to make clear that notification of the commander within 24 hours of confinement is mandated by Article 11(b). Thus, in such cases, government agents have the equivalent of one day to make the report. The Analysis also points out that Congress enacted Article 11(b) to set in motion the procedures for approving or disapproving that confinement. This portion of the Analysis makes clear that the rule "places the initial decision for pretrial confinement with the prisoner's commander."

> Although the immediate commander may not be a neutral and detached official for pretrial confinement purposes, it is appropriate to give this officer the initial decision on pretrial confinement, so that the command implications of this determination may be fully considered and developed for later review. This will enable the commander, who is in the best position to assess the predictive elements of the pretrial confinement decision, including not only the prisoner's likely behavior, but also the impact of release or confinement on mission performance, to make a record of such factors for initial review....

> The 72–hour requirement is intended to ensure reasonably prompt action by the commander, while at the same time allowing for situations in which the commander is not immediately available....

MCM, 1984, Analysis, R.C.M. 305(h), App. 21, at A21–15 (citations omitted).

This passage reflects a truism—the commander is responsible for the effects of having the accused return to his unit, not the magistrate who may have no experience at all in the practical realities of command or accomplishing this or any other unit's mission. In the vast majority of cases, the commander knows the confinee far better than the magistrate does or ever will.

Further, in explaining the reason for adding the prevention of serious misconduct as a ground for continued pretrial confinement, the Analysis states:

> The need for confinement to prevent serious misconduct is particularly acute in the military. The business of military units and the interdependence of their members render the likelihood of serious criminal misconduct by a person awaiting trial of even graver concern than in civilian life. Moreover, ... these concerns render a broader range or [sic] misconduct of a potentially serious nature. For example, the "quitter" who disobeys orders and refuses to perform duties, while others are expected to carry out unpleasant or dangerous tasks, has immensely adverse effect on morale and discipline which, while intangible, can be more dangerous to a military unit than physical violence. Thus, although the "pain in the neck" may not be confined before trial solely on that basis, the accused whose behavior is not merely an irritant to the commander, but is rather an infection in the unit may be so confined. Even constant supervision accomplishes little in such cases, and military resources do not permit, nor is it reasonable to require, the establishment of some holding facility other than a confinement facility for such persons.

MCM, 1984, Analysis, R.C.M. 305(h)(2)(B), App. 21, at A21–16 (citations omitted). Again, the Analysis points to realities and factors that are indisputable in military society but which are generally absent or substantially less pronounced in civilian life.

Although the Analysis of R.C.M. 305 may not be cited as the President's intent, MCM, 1984, Analysis, Introduction, App. 21, at A21–3, the conclusions of the Working Group demonstrate that government officials, with the benefit of experience with thousands of magistrate hearings conducted under the various magistrate programs of the services and the Coast Guard, carefully balanced the government's interests against those of pretrial confinees in determining the procedures for instituting and maintaining pretrial confinement. The

more senior officers of the Joint–Service Committee then sent the rule to the Code Committee. The proposed rule was made public and comments were received from the public and the Department of Defense (DOD). After the Working Group considered the comments and made changes, the rules went back to the Joint–Service Committee before submission to the DOD General Counsel and submission to the President after transmittal to the Office of Management and Budget. After Congress passed the Military Justice Act of 1983, the Rules for Courts–Martial were again examined by the Working Group and changes went through a similar procedure. Finally, the 7–day period following the order of confinement for the magistrate's hearing became a uniform provision for all services. In short, this rule was the product of careful, thorough consideration by executive officials, based on extensive data drawn from years of experience, and the public reviewed the proposed rule with the opportunity to comment on it prior to its consideration and passage by Congress.

## V. THE RATIONALE BEHIND THE McLAUGHLIN HOLDING

The majority in *McLaughlin* emphasize that the Court's holding is based on a reconciliation of the same competing interests that underlay the holding in *Gerstein*. Those competing interests are: (1) the States' "strong interest in protecting public safety by taking into custody those persons who are reasonably suspected of having engaged in criminal activity," and (2) the fact that "prolonged detention based on incorrect or unfounded suspicion may unjustly 'imperil [a] suspect's job, interrupt his source of income, and impair his family relationships.'" *McLaughlin*, —— U.S. at ——, 111 S.Ct. at 1668, (citing *Gerstein*) The holding of *Gerstein* was a " 'practical compromise' between the rights of individuals and the realities of law enforcement." At ——, 111 S.Ct. at 1668 (citing *Gerstein*). The Court made clear that *"Gerstein* struck a balance between competing interests; a proper understanding of the decision is possible only if one takes into account both sides of the equation." At ——, 111 S.Ct. at 1669.

A specific time limit was necessary to the majority in *McLaughlin* because of the flood of litigation in the federal courts due to the wide variety of practices in cities and counties throughout the United States regarding the delay between detention and the probable cause hearing. The announced 48–hour presumption was "to provide some degree of certainty so that the *States and counties* may establish procedures with confidence that they fall within constitutional bounds." At ——, 111 S.Ct. at 1670 (emphasis supplied). Thus, jurisdictions that met the 48–hour limit would "be immune from systemic challenges." *Id.* The presumption was therefore in large part a judicial device to reduce federal court litigation of claims arising from countless different procedures employed by states and local jurisdictions.

The extended dissent by Justice Scalia focuses on the common law right of a citizen arrested without a warrant to be taken before a magistrate as soon as reasonably can be done, a right embodied in the Fourth Amendment. Justice Scalia concluded that the promptness requirement means that the detained suspect must be taken before a magistrate immediately after completing the administrative steps incident to arrest and arranging for the magistrate. Relying on the available data, he noted that the federal courts, most state courts, commissions, and commentators generally have concluded that in civilian jurisdictions the administrative processing incident to arrest and arranging for a magistrate's hearing took no more than 24 hours in the great majority of cases.

## VI. APPLICATION OF McLAUGHLIN TO THE CASE AT BAR

Given the President's statutory authority to make rules such as R.C.M. 305, and the substantial evidence that the rule was in fact carefully considered by knowledgeable agents of the executive branch, nothing in *McLaughlin* suggests, much less mandates, that the President's rule be overturned. The first factor in the balance

described in *McLaughlin,* the government's "strong interest in protecting public safety by taking into custody those persons who are reasonably suspected of having engaged in criminal activity," is demonstrably greater in military society. On the other side of the equation, as I have noted previously, the consequences of pretrial confinement to the innocent military accused are nothing like that suffered by the civilian confinee.

Further, military courts constitute a unitary judicial system. R.C.M. 305 is a clearly defined and easily understood rule that until now has produced little appellate litigation. Thus, the practical reason for the presumption of *McLaughlin,* to preclude repetitive litigation by giving the States and counties a fixed standard, is entirely absent from our court system. Finally, the experience and data relied upon in setting the 48–rule of *McLaughlin* is irrelevant to military experience. As I have pointed out, our experience and data derive from the several magistrate programs that existed before R.C.M. 305 became law. The majority in this case do not even discuss whether any link exists between the experience and data considered in *McLaughlin* and that from the military which existed when the President promulgated R.C.M. 305 or exists now.

Nor does the *McLaughlin* dissent relate in any logical manner to the case before us. Justice Scalia wrote of a common law rule and common law traditions that have never applied to military service. Every source of data or consideration of this issue mentioned by him is unrelated to military tradition or practice. Indeed, the basis of his opinion itself shows how little relevance *McLaughlin* has to military law.

The Supreme Court never contemplated military rules or interests in *McLaughlin,* and the majority in this case essentially ignore, among many other things, an essential feature of R.C.M. 305 that protects identifiable, fundamental interests—the commander's probable cause determination and continuation of confinement decision. In order that the commander can make a reasonably informed decision, he must not only gather information concerning the alleged crime and the accused's suspected participation in it, but just as importantly, he must be given time to balance the effect of the crime and the accused's continued freedom against the loss of the accused's service on the efficiency and capability of his unit and the accused's liberty interest. Experienced military officers are well aware that even obviously guilty accuseds are often released from pretrial confinement solely on the ground that they are needed in the unit. This stage offers every pretrial confinee a chance for release based on the needs of the unit or simply the personal predilections of the commander, something that is nonexistent in civilian life. The President apparently considered this to be an important stage. The importance of this step in the pretrial confinement process justifies pushing back the time when the magistrate must hold a probable cause hearing. Further, when I factor in the congressionally-mandated requirement that rules of practice and procedure must as much as is practicable be uniform among the services, *see* Article 36(b), and the world-wide character of military service, R.C.M. 305 easily passes constitutional muster. I have no doubt that if this issue involving military pretrial confinement procedures is presented to the Supreme Court and the Court reexamines the interests involved, the Court will accede to the President's considered determination that the military pretrial detainee may experience 7 days of confinement before a probable cause hearing takes place.

My dissent is not only from the majority's specific holding in this case, it is more basic. I believe that as military appellate judges we are expected to integrate the realities and necessities of our separate and distinct military society with those of American society in general in deciding the cases before us that involve constitutional issues. Congress expects us to bring our military experience and knowledge of the requirements and operation of a world-wide military system to our appellate duties. When given the initial appellate opportunity, we are tasked with deciding which decisions of the Supreme Court apply to the

military services based on the uniqueness of military society as well as those factors that civilian and military society share. We were not created to be appellate ciphers whose purpose is to copy Supreme Court holdings thoughtlessly and paste them onto our decisions. The majority's unspoken implication that we may not analyze Supreme Court decisions to determine the rationale and salient facts behind their holdings and decide whether that rationale or those facts are distinguishable from the cases before us suggests that in constitutional interpretation we have no meaningful role at all.

The expressed basis for the majority decision is given in one sentence: "Because we believe the Court of Military Appeals has established the precedent that *Gerstein* is applicable to the Armed Forces, and *Gerstein* involves a constitutional issue, we conclude that we must follow that constitutional precedent." Of course, the holding of *Gerstein* is only that a probable cause hearing must take place "promptly" after initiation of pretrial confinement. "Promptness" in this context is as much defined by facts and experience as is "reasonableness" in the search and seizure arena. Yet, as has been shown before, the 48–hour standard of *McLaughlin* is based on experience and data derived from civilian state and local practice that is totally unrelated to military realities.

The majority assert that under the rule of *Jacoby* the burden is upon the government to show that *McLaughlin* is inapplicable to military law and procedure. Previous military decisions applying the Fourth Amendment to military situations have never required specific facts in the record or a *DuBay* hearing to establish fundamental differences between civilian and military society that justify a different legal rule for courts-martial. "Military exigencies may be present under the facts of a given case; *or they may exist with respect to a whole category of intrusions."* Morris, 28 M.J. at 10 (emphasis added) (citations omitted); *Middleton,* 10 M.J. at 127. When obviously relevant and substantial differences exist between civilian and military society that justify deviating from a constitutional principle emanating from civilian

society, neither the Supreme Court nor our military courts have hesitated to acknowledge them.

Further, placing such a burden on the government in this case is tantamount to presuming the unconstitutionality of a Rule for Courts–Martial. Such a presumption cannot be reconciled with the traditional, long-standing deference with which the Supreme Court has reviewed congressional legislation regarding the military services or Presidential regulations governing military service. The President's rule is much more than an interesting opinion or strong advice, it is a regulation promulgated by the statutory authority of Article 36, UCMJ, 10 U.S.C. § 836. Article 36 derives directly from a constitutional provision that is an inherent element of our constitutional scheme and a recognition of the necessary authority of the Commander-in-Chief. U.S. Const., Art. I, § 8. The majority give virtually no deference to the President's determination that in our world-wide military structure, based on experience and available resources, 7 days is a reasonable period to complete the commander's confinement review and collect the required parties at one location for a magistrate's hearing. Rather than granting this decision the substantial weight that it deserves, without pointing to any facts in the record, they conclude that the 48–hour rule of *McLaughlin* has been in effect without difficulty in the Army since 24 May 1991. Even if this assertion is true, and it is unclear on what data or information the assertion is based, it is irrelevant since the mission, organization, and operations of the Army are quite different from those in the Navy or the Marine Corps.

## VII. THE PRACTICAL RESULT OF A 48–HOUR PRESUMPTION IN THE MILITARY

I am unsure how the majority's adoption of *McLaughlin* applies to military practice. If Seaman Deuce is an unauthorized absentee (AWOL in other services) for several months and is picked up in a traffic stop in Bucksnort, Tennessee, does the 48–hour clock start when civilian authorities appre-

hend him for the military, when the military is notified, when the chasers finally get to Bucksnort, when the chasers get him to the nearest military confinement facility, or when he returns to the confinement facility near his unit? During oral argument, appellate defense counsel contended that the clock does not begin ticking until the accused is ordered into pretrial confinement by a military authority. *United States v. Ballesteros*, 29 M.J. 14 (C.M.A. 1989), holds that when civilian authorities apprehend a military absentee solely for the military, even far from the servicemember's unit or any military base, the R.C.M. 305 clock begins once the civilians notify military authorities of his detention and availability for pick-up. In hundreds of cases, however, the accused is apprehended far from any military magistrate, military lawyer, or any other military authority. If *Ballesteros* continues to be the law, in a whole class of cases involving unauthorized absence, the 48–hour presumption routinely will be exceeded, resulting in a flood of litigation to determine if the presumption is rebutted—the sort of flood that *McLaughlin* was intended to preclude.

Nothing before us indicates that a significant number of accuseds are now being confined without probable cause. We have no statistics showing how many accuseds who are confined pursuant to probable cause are released by the magistrate because continued confinement is unwarranted. No evidence before this Court suggests, much less establishes, that military authorities are not now trying to hold the magistrate hearing as soon as is practicable. If they are now doing their best with the resources that are reasonably available, the 48–hour presumption probably will not hasten magistrate hearings. If military authorities are now lackadaisical in meeting UCMJ requirements to prevent any unnecessary delay in the disposition of a case, the threat of a few days of additional sentence credit will not scare those authorities

into action. In the cases of the unauthorized absentees mentioned above, it is fatuous to contend that in fact probable cause to confine is lacking. What *will* be lacking before 48 hours is the presence of a magistrate to hold a hearing or available proof of probable cause or sufficient presentable evidence to justify continued confinement. Thus, the result will be that in numerous cases the guilty accused, for whom probable cause to confine always existed, will receive a confinement credit in addition to that mandated by *United States v. Allen*, 17 M.J. 126 (C.M.A.1984).

The dissent in *McLaughlin* emphasizes that its rule is intended to be a protection for the innocent accused confined before trial. Certainly, a 48–hour presumption may hasten some hearings. In fact, however, even with a 48–hour presumption, if governmental authorities are indifferent to their duty to hold a hearing promptly, and an innocent military accused is released from confinement after a tardy hearing, no remedy is available at all since innocence generally means no sentence against which a credit can apply. This accused is left with the same remedies that now apply, such as Article 138 complaints, when a commander locks up a servicemember on nonexistent or flimsy evidence.

For these reasons, I would hold that the 48–hour rule of *McLaughlin* is inapplicable to the military and that R.C.M. 305 accords fully with constitutional requirements. I would affirm the findings and sentence as approved on review below.

Note: Judge Tuthill reported for two weeks' annual training on 1 March 1993 and did not participate in the case.